**Ramon MONTOYA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69186.

Court of Criminal Appeals of Texas, En Banc.

Feb. 18, 1987.

On Rehearing Oct. 28, 1987.

John H. Hagler, Dallas, for appellant.

Henry Wade, Dist. Atty., John Vance, Dist. Atty., and Kathi Alyce Drew, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted in Dallas County of capital murder. See V.T.C.A., Penal Code Sec. 19.03(a)(1). After the jury made an affirmative finding of the special issues in Art. 37.071, V.A.C.C.P., the trial court imposed the penalty of death by lethal injection. This case is before us on direct appeal.

The appellant advances seventeen points of error. A review of the facts is necessary.

The testimony revealed that Officer John Pasco of the Dallas Police Department was shot and killed while trying to apprehend appellant. On January 16, 1983, at approximately 4:00 p.m., appellant and others were drinking beer in the vicinity of 1800 Park in the City of Dallas. When Pasco arrived, appellant began to move away from the group of people. Then Pasco began to pursue appellant individually, and appellant started to run. Pasco chased him. Appellant testified that while Pasco was chasing him, he attempted to remove a pistol from his waistband and throw it away so Pasco would not catch him with it.

The weapon discharged and Pasco, who according to appellant had grabbed appellant's arm, was shot in the head. He died a few hours later.

Officer Jerry Loudermilk testified that, while on patrol duty, he received a call from Officer Pasco to "cover" him.[1] When Loudermilk arrived at the scene, he saw that Pasco had been shot. Several other Dallas police officers were already at the scene: trying to help Pasco and interviewing witnesses. Loudermilk was informed that there was no description yet of the suspect.

Loudermilk returned to his patrol car and began to search the immediate area. While searching, he received information by radio describing the suspect as a short Latin male with a tatoo of a panther on his chest. He continued to search until 6:05 p.m. when he saw the appellant and stopped to talk to him "just for information." At the time, Officer Loudermilk "didn't have any idea" that the appellant was a suspect in the shooting. When Officer Loudermilk stepped out of his car and spoke in Spanish twice to the appellant, the appellant said nothing in response, but turned and started to run away. Officer Loudermilk pursued and detained the appellant. Loudermilk then lifted up the appellant's shirt, and saw the tatoo of a panther on the appellant's chest. He asked the appellant his name. After the appellant responded, Loudermilk placed him under arrest.

A subsequent search of appellant's home uncovered a .25 caliber automatic pistol. Ballistics determined it to be the weapon that fired the fatal shot.

In his first point of error, appellant alleges that the trial court ignored the provisions of the Code Construction Act during his general remarks to the prospective jurors about the special issues in a capital murder trial. In those remarks, the trial court advised the jury panel that they should give the word "deliberately" its common meaning and usage. Appellant's

---

1. The request made by Pasco was not for an emergency type response from other officers, but a call for assistance which is a routine procedure in the Dallas Police Department.

second point of error applies the same allegation to a second panel of prospective jurors. We will consider the two points together.

It is appellant's claim that the word "deliberately", as used in the capital murder sentencing statute, Art. 37.071, (b)(1), V.A. C.C.P., has acquired a technical or particular meaning. Therefore, the Code Construction Act, sec. 311.011(b), requires that "deliberately" be defined to the jury with a particular meaning. Appellant cites *Heckert v. State,* 612 S.W.2d 549 (Tex.Cr.App. 1981), *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1981), and the dissenting opinion of Judge Clinton in *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983) in support of his contention. Appellant claims the failure of the trial court to define "deliberately" during his general remarks to the jury panels requires a reversal of his conviction.

■ We point out that appellant failed to object to the trial court's instruction on the word "deliberately" to either of the jury panels. Appellant did not request that a different instruction be given to the panels. Appellant did not argue to the trial court that the Code Construction Act required him to define the word "deliberately."

Appellant raises these two points of error for the first time on appeal. Nothing has been preserved for our review. Tex. Cr.App.R. 52(a). The errors, if any, are waived. Points of error one and two are overruled.

Appellant's third point of error is that the errors committed by the trial court in points one and two rendered imposition of the death penalty violative of State and federal proscriptions against cruel and unusual punishment. Based on our disposition of points one and two, we find appellant's third point of error unmeritorious. It is overruled.

Points of error four and five allege error in excusing prospective jurors, on the State's motion for cause, because it was not shown that either prospective juror could not vote affirmative answers if the

State sustained its burden of proof. Appellant contends that the standard for excusing potential jurors is "only when a juror 'regardless of his *own* [sic] standards of reasonableness, would insist that the State offer proof ... beyond all doubt, whether reasonable or not' can the court properly excuse him", citing *Woolls v. State,* 665 S.W.2d 455, at 465 (Tex.Cr.App.1983). Appellant misinterprets our holding. *Woolls,* supra, did not state that is the *only* time a juror can be excused. *Woolls* simply held that was why *that* particular juror was excused and in that instance the excusal was proper. See *Woolls,* supra, at 465.

■ The proper standard for excusing a prospective juror on the State's motion for cause is where the record viewed as a whole supports the finding that the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and oath. *Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841, 851 (1985). In adopting this standard, the Court dispensed with *Witherspoon's* reference to automatic decision making and the requirement that a juror's bias be proved with unmistakable clarity.[2] *Wainwright,* supra.

Instead, the Court stated there would be situations where the trial court would be left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. That is why deference must be paid to the trial court who heard and saw the juror and observed that juror's demeanor. *Wainwright,* supra. This Court had adopted this standard for reviewing the voir dire of a prospective juror who was successfully challenged for cause. *Bird v. State,* 692 S.W.2d 65 (Tex.Cr.App.1985, reh. denied).

■ On point of error four we will review the voir dire of prospective juror Ferguson to determine if she was properly excused for cause. During that voir dire, the following exchanges occurred:

**2.** *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

"Q. (State) Could you share with us your personal feelings about the death penalty? How do you feel?

"A. When I wrote that down on Monday I thought there are probably situations in which I would think the death penalty was acceptable. I've had about two days to think about it and I have not come up with any situations in which I would vote for it. I guess, I'm going purely on a gut reaction because I don't know any of the facts of the case. Just I'm sure—I don't know how old the Defendant is. He looks so young. I think to myself I cannot picture a situation in which I would probably vote for the death penalty.

. . . . .

"Q. I gather you're not in favor overall as a proposition of the death penalty?

"A. Right.

. . . . .

"Q. Let me ask you: Has there ever been a time in your life, when you can recollect, you have ever been in favor of the death penalty?

"A. No.

"Q. ... Are you of such a mind or are your feelings so strong against the death penalty you feel you could not realistically in any case, regardless of the facts, ever return a verdict, realistically, that's going to result in the death of another human being or can you?

"A. It's impossible for me to say I would never do it my reaction is to say it would be unlikely for me to do it, to answer questions that would result in a death penalty.

. . . . .

"Q. Right, because of the strong feelings you have in opposition to the death penalty?

"A. I'm saying that it would be difficult for me to say yes, he is going—it would be impossible for me to say yes he's going to be a threat to society unless the proof was so overwhelming like a confession. I'm saying that what you said was probably right.

"Q. ... In essence what you're saying you would automatically be answering the second question no, vote against the imposition of the death penalty regardless of whatever evidence would be adduced at the trial by the State, find some way to rationalize?

"A. I can't say regardless of. I can't even picture what the situation is. I'll have to say that you're probably right.

. . . . .

"THE COURT: ... would you be able to take that oath to render a true verdict according to the law and the evidence in this case?

"THE JUROR FERGUSON: I tell you how difficult this is. I guess—I guess now that I've been through this I can say no, I don't want to be put in that position to have to do that.

"THE COURT: ... are you telling us you would have to violate the oath because of your feelings about the death penalty?

"THE JUROR FERGUSON: Yes.

"Q. (Defense): Are you saying that you would automatically answer that question no, despite the evidence?

"A. I'm not saying I automatically would say no, but I'm saying there is a possibility even though they have proved all three things, I have taken my oath, there is a possibility ... I'm going to say no."

Giving the proper degree of deference to the trial court's observations of prospective juror Ferguson, we conclude that she was properly excused upon challenge for cause. The record makes clear that her views were such as would substantially impair the performance of her duties as a juror in accordance with the instructions and oath. Point of error four is overruled.

On point of error five, it is necessary to review the voir dire of prospective juror Ballentine to determine if she was also properly excused for cause. Pertinent sections of that voir dire follow:

"Q. (State) One you were asked the question, do you know of any reason you would not be a fair and impartial juror in this case and you checked the box yes.

Could you share with us your feelings with regard to that question or would you expand on that?

"A. Well, I don't feel like that I want to be responsible for sending anybody to his death.

. . . . .

"Q. ... your feelings about the death penalty?

"A. Well, I don't know of any particular reasons except like I said before, that I just don't want to be responsible for anybody's death.

"Q. Have you felt that way most of your life or as long as you can recollect, Ms. Ballentine?

"A. I think I have felt that I would not impose the death penalty on anybody all my life probably.

. . . . .

"Q. ... I gather you meant to check the box and you agree with that, I would not, that is if you were saying it, I would not vote to impose the death penalty regardless of the facts.

"A. That's true.

. . . . .

"Q. I gather what you said I think you made yourself crystal clear you could never do that?

"A. No, I could never do that. I couldn't, I couldn't give him the death penalty.

"Q. Regardless of the facts you're being straightforward and honest with us.

"A. Right.

. . . . .

"Q. ... under no circumstances would you ever vote in such a way as would result in the death penalty for anybody, any time, any place?

"A. That's correct.

"Q. Now, it's important that the record be clear these are your feelings, and your words, and your words and not mine?

"A. That's true.

. . . . .

"THE COURT: Ms. Ballentine, I let them ask all the questions they want to without interrupting. You told us awhile ago under no circumstances to vote to impose the death penalty. Is that still your position?

"THE JUROR BALLENTINE: Yes, if I'm the one that would have to give the penalty."

Giving the proper degree of deference to the trial court's determination, we conclude that prospective juror Ballentine was properly excused upon challenge for cause. The record indicates that her views would prevent or substantially impair the performance of her duties as a juror. Point of error five is overruled.

In point of error six, appellant alleges that the trial court erred by improperly excusing prospective juror Washington. Appellant complained that the record did not show that prospective juror Washington would automatically answer a sentencing issue in the negative, regardless of the evidence.

As we have already stated, the Court has abandoned the reference to automatic decision making and the requirement to prove a juror's bias with unmistakable clarity. *Wainwright*, supra; *Bird*, supra. We will review the voir dire of prospective juror Washington to determine if his views were such as would substantially impair the performance of his duties as a juror in accordance with the instructions he received and the oath he would have to take. During voir dire, the following exchanges occurred:

"Q. (State): Furthermore, you checked the box that said I am in favor of the death penalty in certain cases?

"A. I did.

. . . . .

"Q. Are you saying basically because of these feelings of conscience you have a strong way you feel about the death penalty that you would vote against the imposition or vote against the death penalty without regard to the evidence?

"A. I probably would.

. . . . .

"Q. I think what you're saying there may be evidence that would make you feel somebody should receive the death penalty?

"A. Right.

"Q. But no evidence that could ever allow you to give the death penalty, is that right?

"A. That's true.

"Q. Regardless of the evidence?

"A. That's right.

. . . . .

"THE COURT: ... are you telling me that you could not take an oath to render a true verdict according to the law and the evidence on a death penalty case?

"THE JUROR WASHINGTON: I don't think I can.

"THE COURT: You could not take that oath.

"THE JUROR WASHINGTON: I don't think so.

"THE COURT: ... did you say first of all in any criminal case you might not be able to return a verdict of guilty but in a death penalty case you could not return a verdict of guilty? Is that right?

"THE JUROR WASHINGTON: Yes, sir.

. . . . .

"THE COURT: ... Are you saying at the first stage you could not find him guilty knowing that it might lead to the death penalty later on?

"THE JUROR WASHINGTON: Yeah, it would be awful if I did.

. . . . .

"Q. (the Defense): With respect to question 2, if you heard evidence that convinces you beyond any reasonable doubt that the answer to that question is yes would you answer it yes or would you automatically answer it no to preserve the imposition of the death penalty?

"A. I'm not sure.

"Q. Thank you, Mr. Washington. I have no further questions.

"THE COURT: Mr. Washington, let me ask you this: ... Could you take an oath to render a true verdict according to the law and the evidence in a death penalty case? Could you take that oath?

"THE JUROR WASHINGTON: According to the way I feel?

"THE COURT: Yes, sir.

"THE JUROR WASHINGTON: No."

We conclude that prospective juror Washington was properly excused upon challenge for cause. The record makes clear that his views would substantially impair the performance of his duties as a juror in accordance with the instructions and oath. Point of error six is overruled.

In point of error seven, appellant alleges that the retroactive use of a peremptory challenge by the State constituted error. The appellant complains that this detrimentally affected the manner whereby he used his own peremptory challenges. We will review the facts pertinent to this point of error.

Prospective juror number thirty-one (Rogers) was challenged for cause by the State. The attorney for the State cited, as ground for their challenge, Art. 35.16, Section 9,[3] V.A.C.C.P., after the following exchange occurred:

"Q. (State): Your opinion is he (the appellant) is guilty of this offense.

"A. (Rogers): That's my opinion, yes."

The appellant's attorney then notified the trial court that the appellant waived that "ground of challenge made by the state." The trial court granted the State's challenge of prospective juror Rogers.

Immediately prior to the voir dire of prospective juror number fifty nine[4] the attorney for the State requested that, "before the end of voir dire and the jury is actually selected", he be permitted to retroactively use a peremptory challenge on juror Rogers. The following argument then occurred:

3. "That he has a bias or prejudice in favor of or against the defendant."

4. Prospective juror number sixty was the last venireperson selected for the jury.

"THE COURT: They (the State) are going to exercise a peremptory challenge on Samuel Rogers. So I'll permit that.

"MR. PARKS: (Defense) Your Honor, at this time the defense having used their last peremptory challenge yesterday, our 15th, at this time respectfully requests the Court to grant the defense additional peremptory challenges at this time for the reason we ask additional peremptory challenges be granted.

"THE COURT: All right. What's the State's position on that?

"MR. CARDEN (the State): I don't see why they should. This wouldn't have affected whether or not they kept someone.

"THE COURT: It had nothing to do with Mr. Rogers. I wanted to get your views before I ruled.

"MR. CARDEN: It seems inappropriate. This doesn't affect them having to take someone they wouldn't have otherwise had to take.

"THE COURT: Doesn't have anything to do with Samuel Rogers. They are now asking for more. Does the state object to it?

"MR. CARDEN: I don't think we've forced them to take anybody that wasn't disqualified.

"THE COURT: I mainly wanted your view before I rule. I'm going to deny the request."

The appellant failed to object to the State's retroactive use of the peremptory challenge on prospective juror Rogers. As for his request for additional peremptory challenges, the appellant made no attempt to show that he was harmed by having to accept a specific juror that he otherwise would not have had to accept.

In his brief, appellant argues that it was error for the trial court to permit the State to retroactively exercise its peremptory challenge on venireperson Rogers. Appellant cites *Grijalva v. State*, 614 S.W.2d 420 (Tex.Cr.App.1980, reh. denied 1981), and *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr. App.1985, reh. denied) in support of this argument.

On the facts, *Grijalva*, supra, is distinguishable from the instant case. In *Grijalva*, the defendant argued on appeal that a prospective juror had been erroneously excused by the trial court on a challenge for cause. In its response in its brief, the State argued this was a harmless error because it had not used all of its peremptory challenges during jury selection. The State asserted that it could have, during the trial, used one of the unused challenges on the juror erroneously excused for cause. In the instant case, the State retroactively exercised one of its unused peremptory challenges before voir dire concluded.

 The appellant failed to object to the State's substitution of an unused peremptory challenge for a previous challenge for cause. This preserved nothing for review. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980), at 527. The appellant requested additional peremptory challenges but failed to show the trial court, and this Court, that he was forced to accept a juror which he had found to be objectionable. This also preserved nothing for review. *Pierce v. State*, 696 S.W.2d 899 (Tex.Cr. App.1985, reh. denied). Point of error seven is overruled.

In point of error eight, the appellant alleges that the seizure of the murder weapon was illegal, and it was inadmissible at trial, because the search of his apartment exceeded the scope of the search authorized in his written consent.

The appellant voluntarily, and without promises or compulsion, signed a written consent to search his premises. His father, who appellant shared the apartment with, signed a separate, and identical, consent to search. The appellant's consent read in pertinent part:

"... search completely my domicile, buildings outside of my domicile or vehicles found at 1514 McKee # 6. I authorize the search to take any property from my residence that is stolen or other property that which is in violation of the laws of the State of Texas or the United States."

The appellant claims this consent did not authorize the seizure of the pistol which

was used by him in the commission of the crime. He cites *May v. State*, 582 S.W.2d 848 (Tex.Cr.App.1979) in support of this point of error.

*May*, supra, is distinguishable. In *May*, the juvenile who consented to the search of the van explicitly limited the scope of that consent. He only consented to a search of the vehicle for tools. This Court ruled that a subsequent search of the contents of a lunch box found in the vehicle exceeded the scope of the consent. *May*, supra. The instant case is not controlled by the authority cited by the appellant, because he consented to a broader search than the defendant in *May*.

The appellant, as will be seen in ground of error nine, did not speak English. A bilingual Dallas police officer named Donald Ortega interrogated the appellant prior to the appellant signing the written consent to search. During this interrogation, the appellant confessed to the shooting of Officer Pasco. In that confession, appellant told Officer Ortega that after he shot the police officer, "I got up and ran. I threw away the pistol. I ran to my apartment and I changed my trousers." After the appellant confessed, Officer Ortega testified that he asked the appellant, "if he would sign a consent to search and allow officers to search an apartment for any evidence used in the offense." Ortega testified that the appellant said he would.

It is this *oral*[5] consent to search which permitted the police to search for the murder weapon. At the pre-trial hearing, appellant's attorney cross-examined Officer *Ortega* concerning the differences between the appellant's oral and written consent, and whether the police were authorized to search the apartment for the murder weapon.

"Q. (Defense attorney): You say in here that you were looking—asking his permission to search for I guess the literal translation 'things that have been robbed,' is that correct?

"A. (Ortega): Robbed or stolen....

"Q. Or other things that are in violation of the laws of the State of Texas or of the United States.

"A. Yes, sir.

"Q. Property, is that right?

"A. That's correct.

"Q. That wasn't what y'all were looking for at all?

"A. What's that, sir?

"Q. Things that had been stolen or things—property he might possess in violation of the laws of the United States or laws in the State of Texas. That wasn't what y'all were looking for when you went there to search?

"A. Not in violation of the laws of the State of Texas or of the United States, no.

"Q. Were you looking for stolen articles?

"A. No, sir.

"Q. So it would be a fair statement you've got a waiver of or Consent to Search, for things you weren't even looking for.

[A long objection by the State follows.]

"THE COURT: I guess I'll let the officer testify whether or not he thought the murder weapon is something that was in violation of the law.

Officer, what were you looking for when you went to the house?

"THE WITNESS: We were going to look for any evidence that would link anything found there—link to the murder of Officer Pasco, the weapon, clothing or anything. This is why we recovered his identification, took his keys, put them in the property as evidence, the weapon, clothing, anything that's what we are looking for.

"Q. (Defense attorney): That's not what you told Ramon Montoya you were looking for when you asked him to sign this document, is it?

"A. I instructed him when I read to him and he understood that we were going to look or going to a residence to search for anything, any evidence that was from—that was used in the murder.

**5.** All emphasis applied by the writer of this opinion, unless indicated otherwise.

"Q. Why didn't you put that in your consent to search so that his signature would be over a document saying that, instead of relying on what you said he understood?

"A. Like I said before, sir, I did not translate the English *form* that we used into Spanish." [6]

After the appellant orally consented to the search, and then signed the written consent to search, Officer Ortega conducted a search of the appellant's residence. During that search, Ortega found the murder weapon which appellant, in his confession, said he had thrown away. The murder weapon was hidden in a bookcase next to the appellant's bed. This is the weapon that appellant sought to suppress at the pre-trial hearing.

At the conclusion of that hearing, the trial court made the following finding on the appellant's motion to suppress:

"the Court also finds beyond a reasonable doubt that the defendant voluntarily and freely *orally* gave consent to search that goes beyond the boundary set out in the written document here.... I think there was an oral consent to search that goes beyond these written documents and that is expressly included in the search for evidence of the murder of Officer John Pasco and the Court is going to admit that evidence."

 A consent to search may be oral and still be valid. *Garrett v. State*, 400 S.W.2d 906 (Tex.Cr.App.1966); *Marshburn v. State*, 491 S.W.2d 663 (Tex.Cr.App.1973); and see *Jordan v. State*, 506 S.W.2d 217 (Tex.Cr.App.1974) (Where this Court found that the defendant's oral consent to search was valid, even though there were questions about the validity of a written search warrant which the police had in their possession.) The extent of consent to search is limited by the consent obtained in a particular instance. *May v. State*, 618 S.W.2d 333 (Tex.Cr.App.1981).

 In the instant case, the appellant's oral consent to search permitted a search by Officer Ortega for the evidence of the murder of Officer John Pasco. This was the finding of the trial court after hearing testimony at the pre-trial hearing. The trial court's ruling was not an abuse of discretion. We will not disturb that ruling on appeal. Point of error eight is overruled.

In point of error nine, the appellant argues that his written statement was inadmissible because he was denied counsel during his custodial interrogation. Appellant contends the statement was the product of interrogation conducted after he requested counsel, which was not timely provided. As a result, his post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of his initial request for counsel. Appellant cites *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) in support of this ground of error. The Court, in *Smith*, held that, "an accused's post-request responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel."

In his brief, the appellant alleged that he made a clear and distinct request for counsel when he was magistrated, and before he was interrogated. Appellant claimed that the testimony of Magistrate R.L. Middleton showed that appellant made that request. Before reviewing that testimony, we take note of the fact that appellant does not speak English. The magistrate only spoke to the appellant through an interpreter because the magistrate, in his own words, "would not want to try to converse socially or business-wise in (Spanish)." Under questioning at trial by the State, the magistrate testified as follows:

"Q. Were you able to determine whether or not the Defendant had funds to employ an attorney?

"A. I remember—I know he was going to have an attorney appointed. I did ask if he wanted an attorney. Best of my recollection he said he did. I cannot

6. Dallas Police Officer Carolyn Hovey, who did not take part in the interrogation, translated an English language consent to search form into Spanish. She then gave this to Officer Ortega.

recall exactly because I knew I was going to appoint one for him.

"Q. You were going to appoint one because he was charged with capital murder?

"A. That is correct."

However, the police officer, Lawrence Cadena, who interpreted for Magistrate Middleton, gave a different account of the appellant's responses to being apprised of his right to counsel:

"Q. (State): Did you have any problem communicating with him in Spanish?

"A. None whatsoever.

"Q. Was there any conversation about whether or not he could afford a lawyer or wanted a lawyer appointed?

"A. I asked him if he had an attorney and he said he did not. At that point—

"Q. Go ahead.

"A. Judge Middleton stated that he would appoint an attorney for him.

"Q. Judge Middleton said that in English.

"A. That's correct.

"Q. Did you translate that in Spanish for the Defendant?

"A. Yes, I did.

"Q. Did you tell him the Judge says he will appoint an attorney for him or what did you tell him?

"A. That's exactly what I said. The Judge says he'll appoint an attorney for you.

"Q. Did Ramon Montoya respond to that?

"A. He did not say anything.

"Q. Was there any more conversation after that?

"A. No, sir."

After Magistrate Middleton informed the appellant of the charges against him and his rights as set out in Art. 15.17(a), V.A.C.C.P., the appellant was taken to an interview room of the Dallas Police Department. It was there that Officer Donald Ortega, who is also bilingual, met with the appellant. Ortega told the appellant, in Spanish, that he was a police officer assigned to the Homicide section of the Crimes Against Persons division. Ortega then advised the appellant, in Spanish, of his rights as set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant told Ortega "that he did understand the rights I had read to him." Ortega then gave the appellant an additional description of his rights: that appellant did not have to talk to him, that appellant could have a lawyer present, and that appellant could terminate the interview at any time. Ortega testified that appellant did not say that he wanted a lawyer or that he wanted to stop the interview. Officer Ortega then began to interrogate the appellant. Afterwards, appellant swore to, and signed, a voluntary statement form on which he waived his right to counsel, among others.

Lastly, when the appellant testified at trial, he was cross-examined by the State about his interrogation by Officer Ortega:

"Q. And you never told Officer Ortega that you did not want to talk to him anymore, did you?

"A. No.

"Q. You never asked for a lawyer.

"A. No."

Because the record indicates the appellant did not request counsel, *Smith v. Illinois* is not controlling. The magistrate, Middleton, did not understand Spanish and required the assistance of an interpreter to speak with the appellant. The interpreter, Cadena, testified that appellant only responded in the negative to the magistrate's question of whether he had an attorney. The magistrate stated that he decided to appoint counsel to represent appellant because the appellant was charged with capital murder, not because the appellant requested the assistance of counsel.

■ We do not interpret the appellant's negative response to the magistrate's inquiry as a request for the assistance of counsel. The appellant himself testified at trial that he did not ask for a lawyer. We hold that appellant did not assert his right to counsel at the Art. 15.17 hearing.[7] Ap-

---

7. *Nehman v. State,* 721 S.W.2d 319 (Tex.Cr.App. 1986) is distinguishable. In *Nehman,* the defendant requested the assistance of counsel from the magistrate at his Art. 15.17 hearing.

pellant's written statement was admissible. Point of error nine is overruled.

In his tenth point of error, the appellant argues that the State's cross-examination of him regarding his post-arrest silence constituted a denial of due process. When the appellant took the stand at trial to testify in his own defense, he denied that the written statement, which he gave Officer Ortega, was entirely true. Specifically, he testified that he did not intentionally shoot Officer Pasco. While the appellant was being cross-examined, the following exchange took place:

"Q. (the State): This is the first time that you have told the Judge or anyone that that statement is not entirely true?

"MR. PARKS (Defense): Your Honor, going to object to that because that violates this Defendant's right to remain silent after interrogation.

"THE COURT: Sustained.

"MR. PARKS: Ask that the jury be instructed to disregard it.

"THE COURT: I will ask you to disregard the last question.

"MR. PARKS: Respectfully move for mistrial.

"THE COURT: Denied."

The appellant never answered the question which he objected to.

It is apparent from the record that appellant did not remain silent after he was arrested and magistrated. Instead, he chose to discuss with Officer Ortega the facts of the murder of Officer Pasco. At the conclusion of this interrogation, he signed a written statement admitting that he shot Officer Pasco. This confession differed greatly from the appellant's testimony at trial.

In its attempt to impeach the testimony of appellant, the State sought to point out through cross-examination that appellant had not made a previous attempt to inform authorities that his written statement was not entirely correct. Considering the fact that appellant freely and voluntarily spoke with police officers after being arrested and given his Miranda warnings, he could reasonably have been expected to inform the officers before he signed the confession that the statements he made to them were not true in some respects. In *Cisneros v. State*, 692 S.W.2d 78 (Tex.Cr.App.1985), this Court held that:

"the prior silence of a witness as to a fact to which he has testified, where such silence occurred under circumstances in which he would be expected to speak out, may be used to impeach the witness on cross-examination." *Cisneros*, supra, at 83.

Appellant cited *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in support of this point of error. Because the prosecutor in the instant case was impeaching the appellant with a prior inconsistent statement, *Doyle* is inapplicable. In *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the Supreme Court held that

"... Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. We conclude that *Doyle* does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to include 'silence' insofar as it omits facts *included* in the other version. But *Doyle* does not require any such formalistic understanding of 'silence', and we find no reason to adopt such a view in this case."

This Court, in deciding *Nehman*, relied on *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). In *Jackson*, the Court held:

"that if police initiate interrogation *after a defendant's assertion, at an arraignment or similar proceedings, of his right to counsel,* any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid. (Emphasis supplied)."

Because the appellant did not assert his right to counsel at the Art. 15.17 hearing, *Nehman* is not controlling on this point of error.

In the instant case, the appellant's prior inconsistent statement was properly used to impeach him. The State properly used what had been omitted from the appellant's prior statement to impeach him at trial. Also, the trial court did instruct the jury to disregard the prosecutor's question, which rendered the potential error harmless. *Frison v. State*, 473 S.W. 2d 479 (Tex.Cr.App.1971) and *Hawkins v. State*, 505 S.W.2d 578 (Tex.Cr.App.1974). Point of error ten is overruled.

In point of error eleven, the appellant argues that the trial court erred when it did not include, in its charge to the jury, an instruction on the lesser included offense of involuntary manslaughter. Appellant contends that the evidence raised the issue of recklessness, and that the trial court should have instructed the jury accordingly. The State responds that the evidence only raised the issue of criminal negligence, and that the trial court properly instructed the jury on criminally negligent homicide.

In his written statement to the police, the appellant stated:

"I went running from the policeman. He chased me through the alley. He was catching up to me and I had a pistol in my right hand. I had the pistol all during the time he was chasing me. When the policeman was about to catch me he pushed me and I fell on my back. I pointed the pistol and shot at the policeman. I was pointing at his chest when I fired. The policeman fell to one side of me. I got up and ran."

At trial, the appellant gave a different version of the shooting. He testified on direct examination that he did not tell Officer Ortega that he pointed his pistol at the policeman and shot him. Instead, the appellant testified that, while running away from the officer, he took his pistol out of his pants to throw it away. He also stated on direct examination that the officer grabbed him on the arm before his gun fired. The appellant emphasized that he did not point his pistol at the policeman.

On cross-examination, the appellant testified as follows:

"A. No, I did not want to kill him.

"Q. Okay, let me see if we can get these right. You're going to throw the pistol away?

"A. Yes.

"Q. Trying to throw it away?

"A. I was getting it out.

"Q. To throw away?

"A. Yes.

"Q. Keep running?

"A. Yes.

"Q. And the officer is going to catch you anyway?

"A. Yes.

"Q. And you think he was going to arrest you then?

"A. Yes.

. . . . .

"A. I was running and I was taking it out. I had my shirt and my undershirt out. It didn't—my pants didn't have a belt. I was running, and I was getting it out. That's when he grabbed my arm here. When I got up, I had it in my hand."

In order to determine if the trial court erred by refusing to instruct the jury on involuntary manslaughter, we will apply the two-pronged test which was set out in *Royster v. State*, 622 S.W.2d 442 (Tex.Cr. App.1981). First, the lesser included offense must be included in the proof necessary to establish the offense charged. Involuntary manslaughter is a lesser included offense of murder, *Lugo v. State*, 667 S.W. 2d 144 (Tex.Cr.App.1984), and capital murder. The facts of the instant case satisfy the first prong of the test in *Royster*.

Second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense. The trial court concluded that the evidence at trial raised the issue of criminally negligent homicide, but did not raise the issue of involuntary manslaughter. We must determine if there was evidence at trial to indicate that if the appellant was guilty, he was guilty only of involuntary manslaughter.

The difference between criminally negligent homicide and involuntary manslaughter is the culpable mental state required to prove each offense—criminal negligence for the former and recklessness for the latter. *Lewis v. State,* 529 S.W.2d 550 (Tex.Cr.App.1975); *Thomas v. State,* 699 S.W.2d 845 (Tex.Cr.App.1985). Criminal negligence involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. On the other hand, reckless conduct involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct. In contrast, the key to criminal negligence is found in whether the actor failed to perceive the risk. *Lewis,* supra; *Thomas,* supra.

In the instant case, this Court must examine collectively the circumstances from which the appellant's mental state can be inferred, in the light of the definition of reckless conduct. Appellant's testimony at trial raised the issue of criminal negligence. He was aware that the gun was loaded, and that he was being pursued by a police officer. During that chase, he attempted to throw that gun away. He did not, according to him, intend to threaten or harm the police officer.

However, the evidence at trial did not explicitly or implicitly establish that the appellant knew there was a risk to the police officer, and then consciously disregarded that risk. His testimony at trial did not show that the gun was cocked or that he pointed the gun at the officer or in the officer's general direction. The evidence did not show that he threw the gun at the officer. This is not a case like *Simpkins v. State,* 590 S.W.2d 129 (Tex.Cr. App.1979), where the defendant pointed a loaded gun at his victim and consciously disregarded the risk to the victim. This is a case where there was no evidence that the gun was used, or exhibited, in a threatening manner against the police officer. The evidence at trial did not raise the issue of reckless conduct, and did not indicate that if the appellant was guilty, he was guilty only of involuntary manslaughter. Point of error eleven is overruled.

In point of error twelve, the appellant states the trial court erred when it failed to charge the jury on the lesser included offense of murder. Appellant argues that his testimony at trial raised the issue of the lawfulness of his arrest by Officer Pasco. The appellant points out there was no testimony that Pasco had a warrant for his arrest. At trial, appellant denied that he was shooting his pistol in the apartment complex prior to his arrest. At one point, the appellant denied that he had the pistol in his possession when the officers arrived. Appellant concluded that his evidence proved that his arrest was unlawful and, therefore, Officer Pasco was not acting in the lawful discharge of his official duty. Because of this, appellant claims that he was entitled to a jury instruction on the lesser included offense of murder.

Appellant cites *Broussard v. State,* 642 S.W.2d 171 (Tex.Cr.App.1982) in support of this point of error. In *Broussard,* the defendant was charged with the commission of a capital murder which occurred during the course of an aggravated robbery, and he was eventually convicted of robbery. The defendant argued that the trial court erred by instructing the jury on the lesser included offense of robbery. This Court upheld the actions of the trial court because, "the (defendant's) statements indicate he was not guilty of capital murder, but that if he was guilty at all, he was guilty of robbery." *Broussard* is distinguishable from the instant case on these facts. The appellant's testimony at trial did not establish that if he was guilty, it was only of murder.

Whether Officer Pasco was making a lawful arrest is not relevant to determining if Pasco was acting in the lawful discharge of his official duties. A police officer is still acting within the lawful discharge of his official duties when he makes an unlawful arrest, so long as he is acting within his capacity as a peace officer.

This Court dealt with this question as it applies to the offense of resisting arrest or search, V.T.C.A., Penal Code Sec. 38.03. In *Gonzales v. State,* 574 S.W.2d 135 (Tex.Cr. App.1978), we held that

"... Regardless of whether the (defendant's) arrest was lawful or unlawful, the deputy constable was in that lawful discharge of his duty when he attempted to arrest the appellant. It follows that the appellant was not entitled to an instructed verdict of acquittal and was not entitled to an instruction on the requirements of a lawful arrest without a warrant." *Gonzales,* at 137.

This reasoning was approved in *Barnett v. State,* 615 S.W.2d 220 (Tex.Cr.App.1981). In *Barnett,* this Court relied on *Gonzales* when we decided that "even if the arrest was unlawful, the defendant's actions nevertheless constituted resisting arrest."

The same rule has been applied to the offense of aggravated assault where the victim is a peace officer who is "lawfully discharging an official duty." V.T.C.A., Penal Code Sec. 22.02(a)(2)(A). In *Salazar v. State,* 643 S.W.2d 953 (Tex.Cr.App.1983), this Court stated, "a conviction under 22.-02(a)(2)(A) does not depend on whether the arrest was legal, or the defendant's belief about its legality." We ruled that, "while the State must still prove the defendant knew or had been informed that he was assaulting a peace officer, proof that he also knew the officer was "lawfully discharging an official duty" is unnecessary, *Salazar,* at 956.

■ In a prosecution for capital murder, under V.T.C.A., Penal Code Sec. 19.-03(a)(1), wherein the victim was a peace officer who was acting in the lawful discharge of an official duty, evidence that the peace officer was making an arrest which was in excess of his authority does not dispute or challenge the allegation that the officer was acting in the lawful discharge of an official duty. *Franklin v. State,* 632 S.W.2d 839 (Tex.App.—Houston [14th], 1982). In the instant case, the appellant's testimony about the possibly unlawful nature of his arrest by Officer Pasco does not raise the issue that Pasco was not acting in

the lawful discharge of his official duties. For that reason, the trial court properly denied the appellant's request for a charge on the lesser included offense of murder. Point of error twelve is overruled.

In point of error thirteen, appellant states that the trial court's failure to charge on the lesser included offenses is constitutionally prohibited. Specifically, the appellant argues that the failure to instruct the jury on two lesser included offenses which were raised by the evidence at trial rendered the application of the death penalty statute unconstitutional.

However, we have ruled that the evidence at trial failed to raise either of the two lesser included offenses: murder and involuntary manslaughter. As such, this point of error is without merit. Point of error thirteen is overruled.

In point of error fourteen, the appellant alleges that the prosecutor's argument was a comment on the appellant's failure to testify during the punishment hearing of the trial. Appellant claims that this was a reversible error. During the state's closing argument at the punishment hearing, the following occurred:

"MR. BANKS (State): What do we hear from this man over here that it couldn't be deliberately, all my prior conduct, all these past actions, that the man that I am is not such that I'm going to commit acts of violence in the future and I did it?

"MR. PARKS (Defense): I object to a comment on the defendant's failure to testify in the second phase of the trial.

"THE COURT: Sustained.

"PARKS: Ask the jury be instructed to disregard.

"BANKS: I haven't finished the statement at that time.

"THE COURT: All right. Let Mr. Banks finish the statement then I'll permit you to finish your objection.

"BANKS: We know this man's father and cousins were in Dallas, Texas in 1983, in January of this year and if he wanted to call them or anyone else as witnesses to testify that he had a good reputation they could have done that and

we did not hear from those witnesses. That's my entire statement.

"PARKS: I have the record to reflect when Mr. Banks was stating the words to the effect that he has not, whatever those exact words were, he was pointing directly at Mr. Montoya as he said those words and that he had finished his statement when I made my objection.

"THE COURT: Well, the record may reflect that he jested (sic) toward the defendant. The record will speak for itself whether or not he finished the statement. In an abundance of caution I want to sustain your objection. I already have.

"PARKS: I respectfully move for mistrial.

"THE COURT: That's denied."

Appellant argues in his brief that a comment on a defendant's failure to testify at the punishment hearing constitutes fundamental error. In support, he cites *Owen v. State*, 656 S.W.2d 458 (Tex.Cr.App.1983), in which the defendant testified during the guilt-innocence hearing of the trial, but not at punishment. Appellant complains that the prosecutor's statement was manifestly intended to comment on his failure to testify at the punishment hearing. In his supplemental brief appellant states that this violated the statutory prohibition on commenting on a defendant's silence at trial. Article 38.08, V.A.C.C.P. Appellant also states this type of error is rarely cured by instruction.

In the instant case, appellant requested that the jury be instructed to disregard the prosecutor's argument. The trial court did not rule on this request. Instead, the trial court permitted the prosecutor to complete the argument which the appellant objected to at trial. After this, appellant renewed his objection. The trial court sustained the objection. Appellant did not make a new request for an instruction to disregard, or re-urge his earlier request. Appellant failed to secure an adverse ruling on his request for the instruction. He skipped that step, and went on to move for a mistrial. The trial court denied that motion.

A similar series of events occurred in the case of *Johnson v. State*, 611 S.W.2d 649 (Tex.Cr.App.1981). In *Johnson*, the defendant made a motion for a mistrial and did not request an instruction from the court to disregard the comment of the prosecutor. This Court stated that unless the prosecutor's argument is "so inflammatory that its prejudicial effect could not have been alleviated by an instruction to disregard, the failure to request such an instruction waives the error." *Johnson*, at 650.

In the instant case, the prosecutor's argument was not of an inflammatory nature. The prosecutor's argument was not a direct allusion to the appellant's failure to testify. In *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983), this Court held that,

Art. 38.08, V.A.C.C.P., provides that it is improper for a prosecutor to comment upon a defendant's failure to testify. In order for such a comment to be error, it must be direct and not an indirect allusion which might refer to the accused's failure to testify. *Hawkins*, at 80.

This holding was affirmed in *Jones v. State*, 693 S.W.2d 406 (Tex.Cr.App.1985). In *Jones*, this Court held that "the implication that counsel's argument referred to the accused's failure to testify must be clear. It is not sufficient that the language might be construed as an implied or indirect allusion thereto," *Jones*, at 407.

In the instant case, the prosecutor's comments, in the context of his final argument, referred to the appellant's failure to produce testimony from sources other than himself. In this case, those other sources were the appellant's father and cousins. This was not a direct comment on the appellant's failure to testify at punishment. In *May v. State*, 618 S.W.2d 333 (Tex.Cr.App.1981), this Court held that "if a prosecutor's remarks during jury argument may be reasonably construed as referring to the defendant's failure to present evidence through a witness other than himself, reversal is not required." This holding was affirmed in *Banks v. State*, 643 S.W.2d 129 (Tex.Cr.App.1982) and *Davis v. State*, 670 S.W.2d 255 (Tex.Cr.App.1984) (where it was

"obvious that the prosecutor was not manifestly intending to comment or necessarily commenting on the accused's failure to testify.").

Because the prosecutor's argument was not a direct allusion to, or manifestly intended to comment on, the appellant's failure to testify, it was not so inflammatory that its prejudicial effect could not have been alleviated by an instruction to disregard. The appellant's failure to request that instruction waives the error. *Johnson,* supra. Point of error fourteen is overruled.

In point of error fifteen, the appellant asserts that the State made a second comment on the appellant's failure to testify at the punishment hearing. Appellant states this was reversible error and relies on *Owen,* supra, for support.

Appellant testified in his own behalf at the guilt-innocence stage of the trial, giving his version of the facts of the instant case. On cross-examination, he stated that after the shooting occurred and he left the scene of the crime, he went to play some video games. During the closing argument, the prosecutor asked the jury to recall when the appellant was on the stand, and then asked them if they ever heard the appellant say that he was sorry for what happened or that he regretted that it happened. The appellant objected to this comment, and the trial court sustained the objection. Then the appellant requested that the jury be instructed to disregard the statement of the prosecutor, and the trial court so instructed the jury. The appellant's motion for a mistrial was overruled.

When the prosecutor resumed his argument, he stated, "all we know from the evidence after Ramon Montoya kills a police officer it might affect him when he goes to play some video games. Now what kind of man is that ..." The appellant did not object to this last statement.

■ The complained of argument by the State was not a direct allusion referring to the appellant's failure to testify at the punishment hearing. *Hawkins,* supra. Within the context of the State's closing argument, these remarks referred, instead, to the substance of the appellant's testimony at the guilt-innocence phase of the trial.

At best, the State's argument might be construed as an implied or indirect allusion to the appellant's failure to testify. The argument did not directly or clearly refer to that silence and, therefore, did not constitute reversible error. *Hawkins,* supra; and *Jones,* supra.

Whatever harm accrued to the appellant was cured by the trial court's instruction to the jury to disregard the prosecutor's statement. *Johnson,* supra. Point of error fifteen is overruled.

In point of error sixteen, the appellant complains that the prosecutor's argument regarding the appellant's failure to present certain witnesses during the punishment hearing was reversible error. At the punishment hearing, the appellant rested and closed without putting on evidence. During closing arguments, the prosecutor stated:

"MR. BANKS (State): Well, you haven't heard from his family, a friend, an employer, a neighbor. Well, we've heard from the neighbors. How about a preacher, or a priest or a minister. A chaplain, how about anybody to come down and say anything good about the Defendant?

"MR. PARKS (Appellant): We object to that arguing outside the record. There is no evidence that any of these people exist in relationship to this man.

"BANKS: Judge, they have brought evidence as to his family and the Defendant himself has testified about his work record.

"THE COURT: I overrule the objection."

The recent decision of *Mosley v. State,* 686 S.W.2d 180 (Tex.Cr.App.1985), contains a similar set of facts. In *Mosley,* the prosecutor told the jury that they "haven't heard one good thing about this man. Think about it. No one, not a mother, not father, not brother, not sister...." The defendant in *Mosley* objected that the prosecutor was creating witnesses and then complaining about them not being present.

The trial court overruled the objection of the defendant.

██ A prosecutor may comment on the failure of the defendant to call to attest to his reputation any witnesses at all, or some particular known witness who is competent to give material testimony on this matter. However, a prosecutor is not permitted to create witnesses and comment or speculate about what they might say. *Mosley*, supra.

██ In the instant case, the prosecutor's argument was not improper or erroneous. The appellant did not call any witnesses, including reputation witnesses, during the punishment hearing. At the guilt-innocence hearing, evidence was introduced which showed that appellant had family members in the Dallas area. The appellant himself testified about recently working in the Dallas area.

The prosecutor was not creating these witnesses, and then detailing what they might say. Rather, he was emphasizing that the appellant called no one, not even anyone close to him who might be expected to testify in his behalf. This was a proper jury argument. *Mosley*, supra. Point of error sixteen is overruled.

In point of error seventeen, appellant states that the prosecutor made another improper argument at the punishment hearing. In that hearing, the State called many witnesses to testify that the appellant had a bad reputation for being peaceful and law abiding. The defense chose not to cross-examine those witnesses. During his final argument, the prosecutor summarized each of those witness' testimony and then stated that the appellant asked them no questions. When summarizing, the prosecutor argued:

"MR. BANKS (State): They can be challenged and you've seen these lawyers with other witnesses brought in the trial of this case cross-examine and challenge what those people had to say. They chose not to do that which is within their right. Who did you talk to and what did they say if that's not correct?

On appeal the appellant claims that this argument was improper because it asked the jurors to speculate about the basis for the witness' reputation testimony. Appellant cites *Green v. State*, 679 S.W.2d 516 (Tex.Cr.App.1984) in support of this point of error.

██ However, the appellant's objections to this argument at trial differ from the point of error advanced on appeal. At trial, the appellant objected that the argument was prejudicial, inadmissible evidence and, also, that the argument was inadmissible hearsay. Because the ground of error presented on appeal did not comport with the objection raised at trial, nothing is presented for review. *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984); and *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App.1986). Point of error seventeen is overruled.

The conviction of the appellant is affirmed.

CLINTON and TEAGUE, JJ., dissent.

MILLER and DUNCAN, JJ., not participating.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

DUNCAN, Judge.

On original submission appellant presented seventeen points of error, none of which was held to constitute reversible error. In his motion for rehearing, the appellant urges this Court to reconsider its original finding relative to point of error fourteen, or, his contention that the prosecutor's argument was a comment on the appellant's failure to testify at the punishment hearing.

On original submission, we determined that the prosecutor's allegedly offending argument was not of an inflammatory nature and moreover, it was not a direct allusion to the appellant's failure to testify. Instead, we concluded that the prosecutor's comments were a reference to appellant's failure to produce testimony from other sources. Appellant argues that such a

finding ignores not only the words which were actually used but also, the prosecutor's conduct. After reviewing the record we agree with the appellant's assessment of the prosecutor's comment.

The appellant testified at the guilt-innocence phase of the trial but not at the punishment hearing. During the State's closing argument at the punishment phase of the trial, the following occurred:

> MR. BANKS: What do we hear from this man over here that it couldn't be deliberately, all my prior conduct, all these past actions, that the man that I am is not such that I'm going to commit acts of violence in the future and I did it?
>
> MR. PARKS: I object to a comment on this defendant's failure to testify in the second phase of the trial.
>
> THE COURT: Sustained.
>
> MR. PARKS: Ask the jury be instructed to disregard.
>
> MR. BANKS: I hadn't finished the statement at the time.
>
> THE COURT: All right. Let Mr. Banks finish the statement then I'll permit you to finish your objection.
>
> MR. BANKS: We know this man's father and cousins were in Dallas, Texas in 1983, in January of this year and if he wanted to call them or anyone else as witnesses to testify that he had a good reputation they could have done that and we did not hear from those witnesses. That's my entire statement.
>
> MR. PARKS: I want the record to reflect when Mr. Banks was stating the words to the effect that he has, whatever those exact words were, he was pointing directly at Mr. Montoya as he said those words and that he had finished the statement when I made my objection.
>
> THE COURT: Well, the record may reflect that he jested [sic] [gestured] toward the Defendant. The record will speak for itself whether or not he finished the statement. In an abundance of caution I want to sustain your objection. I already have.
>
> MR. PARKS: I respectfully move for a mistrial.
>
> THE COURT: That's denied.

It is a well-known, accepted, basic, and fundamental law in this State that the failure of an accused to testify may not be the subject of comment by the prosecution. *Bird v. State*, 527 S.W.2d 891 (Tex.Cr.App. 1975). Such comment is in violation of the privilege against self-incrimination contained in Article I, Sec. 10 of the Texas Constitution and the express provisions of Article 38.08 V.A.C.C.P., which reads:

> Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

■ In addition to violating the constitution and laws of Texas, a comment on the defendant's failure to testify constitutes a violation of the self-incrimination clause of the Fifth Amendment, which is made applicable to the states by the Fourteenth Amendment. See *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fontaine v. California*, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); *Bird, supra.*

■ Although the appellant testified during the guilt-innocence portion of the trial, this does not in any way limit or restrict his right to not testify during the punishment hearing. The separate dignity afforded each half of the bifurcated trial in relation to a defendant's right not to testify was aptly stated in *Dickinson v. State*, 685 S.W.2d 320 (Tex.Cr.App.1984):

> Recently, in *Brown v. State*, 617 S.W.2d 234 (Tex.Crim.App.1981), this Court stated that "the right of self-incrimination does not end with the jury finding the defendant guilty for, as Presiding Judge Onion said in *Brumfield v. State*, 445 S.W.2d 732 (Tex.Crim.App.1969), 'The mere finding of guilt does not terminate the privilege against self-incrimina-

tion.... the privilege ceases only when liability to punishment no longer exists ...' " *Id.* at 322.

In order to violate the right against self-incrimination and therefore Article 38.08, *supra,* the offending language, when viewed from the jury's standpoint, must be manifestly intended or be of such a character that the jury would necessarily and naturally take it as a comment on the accused's failure to testify. *Banks v. State,* 643 S.W.2d 129 (Tex.Cr.App.1982); *Hicks v. State,* 525 S.W.2d 177 (Tex.Cr. App.1975). It is not sufficient that the language might be construed as an implied or indirect allusion to the defendant's failure to testify. *Banks, supra, Nowlin v. State,* 507 S.W.2d 534 (Tex.Cr.App.1974). In applying this standard, the facts and circumstances of each case must be analyzed to determine whether the language used was of such a character. *Dickinson v. State,* 685 S.W.2d 320, 323 (Tex.Cr.App. 1984). If the remark called the jury's attention to the absence of evidence that only the testimony from the appellant could supply the conviction is subject to being reversed. *Myers v. State,* 573 S.W.2d 19 (Tex.Cr.App.1978).

In defense of its conduct the State cites *Davis v. State,* 670 S.W.2d 255 (Tex.Cr. App.1984) and *Jones v. State,* 693 S.W.2d 406 (Tex.Cr.App.1985) and claims that the present argument was not manifestly intended to be nor necessarily was a comment on the defendants's failure to testify. On the contrary, the State argues that the prosecutor's comments may reasonably be interpreted as a reference to the appellant's failure to produce evidence of good reputation. Both cases are distinguishable from the present situation.

In *Davis v. State, supra,* the prosecutor made the following remark during closing arguments at the punishment hearing:

You think he can be rehabilitated? Look at that witness stand. Was there one shred of evidence before you to tell you he's going to change, he can be changed, he wants to be changed, he will change? *Id.* at 256.

The Court held that "it is obvious that the prosecutor was not manifestly intending to comment on the accused's failure to testify. The prosecutor could have just as easily been discussing the failure of the accused to call any witnesses to testify regarding rehabilitation." *Id.* at 257. In *Davis* the Court held that the prosecutor's argument in that case was not a direct reference to the defendant's failure to testify.

In *Jones v. State, supra,* the other case cited by the State, the court concluded that the prosecutor's argument during the punishment phase "viewed in its entirety can most reasonably be interpreted as a comment not on the appellant's failure to testify during punishment, but upon his testimony in the guilt/innocence phase of the trial." *Id.* at 409. Therefore, any reference to the defendant's failure to testify was at most indirect and was thereafter cured by the trial court's instruction to disregard.

Unlike the situations in *Davis* and *Jones,* the facts and circumstances of the instant case present a direct reference to the appellant's failure to testify. The prosecutor's argument took place during the punishment hearing of a capital murder trial. The jury was to be charged with answering two special issues under Art. 37.071(b) V.A.C.C.P. so as to determine whether a life or death sentence should be imposed. Those issues are:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death would result.

(2) whether there is a probability that the defendant would *commit criminal acts of violence that would constitute a continuing threat to society.* (emphasis added)

It is apparent from the prosecutor's argument that he is rhetorically asking "what do we hear from this man over here" with regard to the two special issues. Moreover, the uncontradicted and unobjected to record reveals that the prosecutor was at the least gesturing towards the

appellant when the comment was made. Examining this comment from the standpoint of the jury, it is evident that the prosecutor's comments were directed at the appellant despite his subsequent attempts to redirect the comments.

As a general rule "[t]he prosecutor may comment on the failure of the defendant to call to attest to his reputation any witnesses at all or some particular known witness who is competent to give material testimony on the matter." *Mosley v. State*, 686 S.W.2d 180, 183 (Tex.Cr.App.1985). The State, in this case, contends that taken as a whole, the prosecutor's argument clearly refers to the evidence with respect to the defendant's reputation in the community, not as a direct and flagrant reference to the appellant's silence. This contention simply ignores both what was said and how he said it.

After directing the jury's attention to the appellant by gesturing towards him, the prosecutor used the pronoun "I" or its possessive form four times. In *Cherry v. State*, 507 S.W.2d 549 (Tex.Cr.App.1974), the prosecutor began suggesting to the jury several defenses which the defendant could have raised, but did not. In doing so the prosecutor said:

> Now what defenses are available to a person in a case like this? Number one, alibi, I was somewhere else, I was with someone else. *Id.* at 550.

The Court held that the choice of the word "I" contradicts any theory that the prosecutor was referring to witnesses other than the appellant. *Cherry v. State, supra;* see also, *Cook v. State*, 702 S.W.2d 597 (Tex. Cr.App.1984).

Likewise, the prosecutor in *Cook v. State, Id.*, while discussing the possible defense of alibi said, "using the alibi, because, 'I was somewhere else, I've got my alibi, because I was playing poker with the guys.'" *Id.* at 598. The Court held that, "the prosecutor's use of 'I' was inescapably a reference to appellant and his failure to testify." *Id.* at 600. The conclusions of the Court in both *Cherry* and *Cook* are just as applicable to the present case where the

prosecutor made repeated use of the pronoun "I".

■ Furthermore, while it is well recognized that a prosecutor may comment on a defendant's failure to produce evidence, this is limited in one major respect. *Garrett v. State*, 632 S.W.2d 350 (Tex.Cr.App. 1982); *Nowlin v. State*, 507 S.W.2d 534 (Tex.Cr.App.1974). Such a comment cannot concern the failure to produce evidence of which only the defendant has knowledge. *Angel v. State*, 627 S.W.2d 424 (Tex. Cr.App.1982); *Nickens v. State*, 604 S.W.2d 101 (Tex.Cr.App.1980). For example, in *Myers v. State, supra,* an indirect comment on the defendant's failure to testify was reversible error where the prosecutor drew reference to the fact that no explanation had been offered as to why the defendant was in possession of such a large quantity of marihuana.

Similarly, in *Cook v. State, supra,* the only real issue was the consent or lack thereof of the complainant in an aggravated sexual abuse trial. It was held improper for the prosecutor to refer to the lack of evidence concerning the attack itself or any "affirmative consent ... during the attack," *Id.* at 600, because "[t]hat evidence could only have come from the appellant himself." *Id.*

Returning to the prosecutor's argument in the present case, only the appellant could testify directly as to whether the offense with which he had been convicted was committed deliberately. The appellant was also the only one who could testify as to whether "I'm going to commit acts of violence in the future". Despite the State's contentions, neither the appellant's father or cousins could directly testify as to either of these matters.

Further, the prosecutor's contention at trial that defense counsel's objection had interrupted his statement strains credulity. The two separate statements bear absolutely no continuity of thought or purpose. The appellant's failure to call reputation witnesses bears no logical relationship to the prosecutor's rhetorical question, "[w]hat do we hear from this man over here" with regard to whether he acted de-

liberately or whether he would commit future acts of violence.

As noted in our original opinion, after objecting to the prosecutor's argument, defense counsel requested a motion to instruct the jury to disregard the comment. Before obtaining a ruling on his request, the prosecutor was given an opportunity to "finish" his statement, which he did. Thereafter, rather than again seeking an instruction to disregard, defense counsel only requested a mistrial which was denied. The original opinion held that the appellant waived any error for failure to request the proper instruction. This was based on the erroneous finding that the prosecutor's argument was not a direct allusion to, or manifestly intended to comment on the appellant's failure to testify and that it was not so inflammatory that its prejudicial effect could not have been alleviated by an instruction to disregard.

■ A reference to the defendant's failure to testify is either direct or indirect. The importance of requesting a motion to instruct the jury to disregard depends on whether the reference is classified as either direct or indirect.[1] The prejudicial effect of a direct reference to the defendant's failure to testify normally cannot be cured by an instruction to the jury to disregard. For an indirect comment to constitute reversible error, it must call for a denial of an assertion of fact or contradictory evidence that only the defendant is in a position to offer. *Losada v. State,* 721 S.W.2d 305 (Tex.Cr.App.1986); *Short v. State,* 671 S.W.2d 888 (Tex.Cr.App.1984). Any other indirect comment must be properly preserved for review or it is waived.

The failure to request an instruction to the jury to disregard the comment of the prosecutor before seeking a mistrial was before this Court in *Johnson v. State,* 611 S.W.2d 649 (Tex.Cr.App.1981). Despite the defendant's failure to request an instruction to disregard, the Court nonetheless reversed the defendant's conviction be-

cause the prosecutor's argument was a direct and flagrant reference to the defendant's failure to testify. Normally, the failure to request a motion to disregard will waive error only if the prejudicial effect of the prosecutor's remarks could have been cured by a proper instruction. *Johnson v. State, Id.* In *Johnson,* however, it was recognized that the prohibition against a direct comment on the defendant's failure to testify is mandatory and the adverse effect of any reference to the accused's failure to testify is not generally cured by an instruction to the jury. See also: *Owen v. State,* 656 S.W.2d 458 (Tex.Cr.App.1983); *Overstreet v. State,* 470 S.W.2d 653 (Tex. Cr.App.1971). Thus, given a direct reference to the accused's failure to testify, an instruction to disregard is of dubious value.

■ *Johnson* should not be read to lessen the importance of requesting an instruction to disregard. It does however, recognize the tremendous protection which is extended to a defendant who exercises his State and Federal Constitutional rights not to testify. In the instant case, the prosecutor made a direct reference to the defendant's failure to testify in regard to the two special issues which must be answered during the punishment phase of a capital murder trial. Article 37.071, V.A.C. C.P. A motion for an instruction to disregard was not necessary to preserve error of this magnitude. *Johnson v. State, supra.* By requesting a mistrial, defense counsel made a proper request for relief in this instance. In acknowledging the dubious value of requesting a motion to disregard, it is apparent that the only request which could possibly yield effective relief was a motion for mistrial.

■ As previously noted, in *Cook v. State, supra,* on the State's Motion for Rehearing the Court again concluded that the prosecutor's use of the pronoun "I" "was inescapably a reference to appellant and his failure to testify." *Id.* at 600. Despite its conclusion that the prosecutor's

---

1. See *Gardner v. State,* 730 S.W.2d 675, 700 fn. 13 (Tex.Cr.App.1987) ("More recent decisions have shown that while it is indeed rare, it is not unheard of that an instruction to disregard an

*oblique allusion* to an accused's failure to testify may be found to have cured error.") (emphasis added).

comment was a direct comment on the defendant's failure to testify the Court reviewed the evidence to determine whether the impermissible argument constituted harmless error under the test set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although we do not approve of the prosecutor's blatant violation of Article 38.08, V.A.C.C.P. we nevertheless feel that such an analysis is appropriate in this case. The test, which is adopted from *Chapman v. California*, *supra*, is that it must be determined beyond a reasonable doubt that the error did not contribute to the verdict. *Cook v. State, supra*. To determine whether an improper prosecutorial argument is harmless the totality of the facts and the arguments of the parties must be examined. *Cannon v. State, supra*. The issue of harm must be determined from the facts of each individual case and resolved according to the "probable effect [the argument] has on the minds of jurors." *Cook v. State, supra* at 601 (citing *Mayberry v. State*, 532 S.W.2d 80 (Tex.Cr.App.1975)).

 It is well established that at the penalty stage of the trial, the jury may consider all of the evidence adduced at the guilt stage. *Turner v. State*, 698 S.W.2d 673 (Tex.Cr.App.1985); *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984). The appellant testified at the guilt-innocence phase of the trial that the shooting of Officer Pasco was an accident. According to the appellant, he ran from Officer Pasco because he did not want to be apprehended with a pistol in his possession. As he was trying to throw the pistol away, Officer Pasco caught him by the arm. This caused the appellant to fall and Officer Pasco to then fall on top of him. As this was happening the appellant's gun discharged resulting in Officer Pasco's death. Appellant also testified that after the shooting he went home and changed clothes. Shortly thereafter, appellant began to walk to a local store when he was arrested. When asked by the prosecutor why he was going to the store, the appellant responded "[t]here were machines to play. Maybe I was going to play some machines."

The appellant's description of events at trial differed significantly from the version given in a written statement to the police:

I went running from the policeman. He chased me through the alley. He was catching up to me and I had a pistol in my right hand. I had the pistol all during the time he was chasing me. When the policeman was about to catch me he pushed me and I fell on my back. I pointed the pistol and shot at the policeman. I was pointing at his chest when I fired. The policeman fell to one side of me. I got up and ran.

The jury obviously rejected the appellant's testimony and accepted this latter version when it returned its verdict of guilty of capital murder.

The appellant's admitted desire to avoid apprehension while in possession of a weapon was well founded. Less than one year prior to his shooting and killing Officer Pasco, the appellant was arrested by Officer Pasco and another officer for unlawfully carrying a weapon, after the appellant was seen pointing the pistol at another man. For this offense the appellant was sentenced to ten days in the Dallas County Jail and subsequently deported to Mexico.

During the punishment phase of the trial the State presented thirteen witnesses who each testified that the appellant's reputation in the community where he lives as a peaceful and law-abiding citizen was bad. Understandably, the defense did not cross-examine any of the State's witnesses.

In addition to the reputation witnesses the State presented additional testimony during the punishment stage of the trial. For example, Robert Aguilar, who lived in the same neighborhood as the appellant, testified that the appellant stabbed him twice.

Several other witnesses described another incident in which the appellant again wielded a knife. According to the witnesses, the appellant accompanied another individual to attempt to get repayment for an alleged debt. In doing so, the appellant exhibited a knife and later chased several people with it. The police were called and

appellant was arrested while hiding in an apartment.

San Juanita Ramirez testified that on one occasion she found the appellant beating her roommate. The witness left to call the police. Before she could finish dialing the number at a nearby phone, appellant arrived and began beating her with his hands and a cast which he was wearing on his arm. Apparently, not satisfied with the two previous attacks the appellant then gratuitously beat another woman who was using a nearby telephone.

Officer D.L. Cannon of the Dallas Police Department testified that less than one year prior to the shooting of Officer Pasco he had occasion to arrest the appellant for unlawfully carrying a weapon. Ironically, Officer Cannon was accompanied and assisted by Officer Pasco at the time. The appellant was observed pulling a pistol on another man in an alley. The appellant was arrested and transported to the police station. Officer Cannon testified that the appellant spent the entire journey staring directly at Officer Pasco, his future victim. As previously noted,° the appellant eventually served ten days in the county jail and was deported to Mexico.

Another Dallas police officer, Officer Salcedo, described another violent incident involving the appellant. Officer Salcedo testified that while working on an unrelated incident the appellant walked up to him and began talking in Spanish. The officer replied in Spanish that he was involved in another matter and that the appellant should not get involved and should leave. Instead of leaving the appellant began cursing the officer in Spanish. The officer again told him to leave, whereupon the appellant attempted to strike Officer Salcedo. The appellant was arrested.

Finally, the appellant's pen packet was introduced. It revealed that in 1975 the appellant received three years probation for burglary of a building. In addition, the appellant was assessed punishment of forty days in the county jail for evading arrest on the burglary offense. In 1982, appellant was convicted of unlawfully carrying a weapon in the incident previously described

by Officer D.L. Cannon. The defense did not call any witnesses at the punishment hearing.

The totality of the evidence introduced during the punishment hearing established a pattern of violence, intimidation and lawlessness on the part of the appellant. This testimony was neither contradicted, impeached or rebutted by the appellant. The evidence made it very clear that the appellant has a proclivity for violence. For example, the appellant was known to carry a knife and on at least two occasions was shown to have used or attempted to use the knife to stab another person. The evidence also showed that the appellant after beating one woman, beat another woman who was attempting to call the police, and then beat still another woman who happened to be nearby.

In addition, on another occasion the appellant was convicted of attempting to evade arrest. The appellant was also arrested for trying to strike a police officer who was investigating another incident. In addition, the appellant was found hiding underneath a stack of clothes in an apartment after police had been called to investigate an attempted stabbing. Finally, the appellant admittedly ran from Officer Pasco when he attempted to apprehend the appellant. The appellant has consistently engaged in a pattern of violent conduct that has posed a danger to police officers and others.

This pattern of conduct ultimately led to the confrontation between the appellant and Officer Pasco. Officer Pasco had been called to investigate a report of shots being fired. When Officer Pasco arrived he saw the appellant with a gun and gave chase. As Officer Pasco tried to apprehend the appellant, he was shot in the head. Immediately after shooting Officer Pasco the appellant ran home and changed his clothes. He then began walking to a store to perhaps play video games. On the way to the store the appellant was stopped by Officer Loudermilk. Despite the appellant's effort to flee he was subdued and arrested. Before anything was said between Officer Loudermilk and the appel-

lant, the appellant told the officer, "Fuck You."

The appellant's conduct before and after the shooting give no indication that Officer Pasco's death was the result of an accident.

An examination of the totality of the facts and the arguments of the parties indicates that the prosecutor's comment on the appellant's failure to testify was harmless. Although the prosecutor's comment was unnecessary and under a less compelling set of facts would have caused a reversal of the appellant's conviction and sentence, we find beyond a reasonable doubt that the prosecutor's comment did not contribute to the jury's resolution of the special issues which were submitted. *Chapman v. California, supra.*

The appellant's Motion for Rehearing is denied and the conviction and judgment are affirmed.

ONION, P.J., not participating.