Joe Martinez **SALAZAR, Appellant,**

v.

The **STATE of Texas, Appellee.**

Nos. 66021, 66022.

Court of Criminal Appeals of Texas, En Banc.

Jan. 18, 1983.

**954**

Robert Udashen, Dallas, for appellant.

Henry Wade, Dist. Atty., William D. Sheetz and Christopher Milner, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

In 1978, appellant pled guilty to attempted aggravated rape and was placed on probation for eight years. In 1980, he was indicted for aggravated assault. After a probation revocation hearing held simultaneously with a non-jury trial, the court that had placed him on probation in the attempted aggravated rape case revoked that probation, and also convicted him of the aggravated assault offense. In each case, appellant was sentenced to three years confinement in the penitentiary, the sentences to run concurrently. In cause number 66,022, appellant challenges his conviction for aggravated assault; in cause number 66,021, he appeals from the revocation of probation in the attempted aggravated rape case, which revocation was based on the aggravated assault offense.

In his sole ground of error, appellant asserts that there is no evidence, or insufficient evidence, to show that he knew or had been informed that the specific person he had assaulted, Steve Spradling, was a police officer, as alleged in the indictment and as required by V.T.C.A., Penal Code § 22.-02(a)(2). A brief rendition of the facts is necessary.

On December 28, 1979, at 4:00 a.m., the appellant and Mike Garza were sitting in a car parked at the curb in front of appellant's house. Two Dallas police officers arrived simultaneously in separate police cars answering a "suspicious persons" call at that address; apparently the call was directed at appellant and Garza. Both appellant and Garza approached the two officers and were, by their own admission and testimony, well aware that the police were police.

The appellant's testimony is as follows:

"Q Now, when did you first see the police that morning?

"A I seen them—when they was driving up the street, Tony said they had passed by, you know. I said, 'Well, we're not bothering anybody. We're not doing anything.' And they passed by, you know, and then the next thing I know Tony and his ex-wife had got out of the car and me and Mike Garza were still sitting in the car and I seen *a squad car* coming down the street with its lights off, with those other lights on, you know.

"Q Now, at this time were you making a lot of noise outside?

"A Not—not that loud. We were playing some music and had the windows up.

"Q You weren't causing a disturbance?

"A No, sir.

"Q Did you and Mike get out of the car then?

"A Yes, after the *officers* drove up and Mike rolled down his window and said, 'Well, let's just get out and talk to them and see what they want,' you know. And they asked me for my ID, you know, identification, you know. And I told them I didn't have any identification. I told them that my name was Joe Martinez Salazar and that I lived there and that was my house, you know; told them that we're not bothering anybody or doing anything, you know." (Emphasis supplied)

Shortly thereafter both men were arrested and Garza was placed in a squad car while appellant was handcuffed but not immediately placed in the squad car. At this point the Dallas police officer, Steve Spradling, the complaining witness, arrived in element (police car) # 432 in response to a call for cover, as had other police officers.

Officer Spradling's account is as follows:

"A I had—I—I had seen Mr. Salazar and Officer Hayes standing beside the police car and I started to walk in that direction. I walked down there to them just to find out what had happened, you know, for my own curiosity, mainly. And Joe Salazar was yelling and cussing or started yelling and cussing just all of a sudden. It seemed like it had already died down, but then it started back up again. And they were—we were trying to place Salazar into the police car. He'd already been placed under arrest and cuffed. We just had to put him in a car. And he refused to get in the car.

"Q What was the problem of getting him in the car?

"A He didn't—he didn't want to go. His size and the fact that he said, 'I'm not going to get in the police car; you're going to have to put me in; you're going

to have to drag me in there. I'm not going to get in that police car.'

\* \* \* \* \* \*

"THE WITNESS: No, sir, I—I—I was kind of back and to the side of him and I was trying to get him down to the opening, the door opening. There was another officer on the other side that was going to try to put him in once we got him down to the door. And there was about three or four officers that had ahold of him. And I noticed that another officer, Hayes, he yelled loud and he cringed and he doubled over and he got pushed out of the way. And I kind of tried to secure him, tried to grab him with my hands, but I guess I might have grabbed for his chin or his face and that's when, I guess, he bit me."

The appellant's rendition is as follows:

"... And I was standing up against the car and they said, 'Well, you get in the *squad car*,' you know. And I said, 'Well, I ain't going nowhere, man, I ain't did nothing, not until you tell me why you're taking me in for. You know, I ain't did nothing, you know.'

"Q Now, did you struggle with them to try to keep them from putting you in that squad car?

"A Well, after they started—two or three of them started choking me and punching me in my stomach, and then I didn't even know I have even kicked that *officer* or—or bit him, you know.

"Q Well, why did these officers start choking you?

"A Because I was getting pretty violent and loud. They were hollering at me, too, you know, and I said—well, I started hollering back at them and they didn't want me to holler back at them, you know, and they kept telling me to be quiet, you know.

"Q Did you kick at any of the officers before they started choking you?

"A No, sir.

"Q Did you threaten them in any way?

"A No, sir.

"Q You just wouldn't get in that police car, is that right?

"A No, sir. I wanted—said, 'Let me talk to my wife. I want to know what the deal is,' if she called them or what, what they're going to take me in for or what, you know." (Emphasis supplied)

Appellant's testimony seems to be directed toward negating the culpable mental state alleged with respect to the action (biting). Now, on appeal, he challenges the evidence regarding his culpable mental state (knowingly)[1] alleged with respect to the status of the complainant (that he was a police officer). Both issues were resolved against him by the trial judge and we find ample evidence detailed above to support that finding (see footnote 1).

*Franklin v. State,* 27 Tex.App. 136, 11 S.W. 35 (1889), and *Crow v. State,* 152 Tex. Cr.R. 586, 216 S.W.2d 201 (1949), cited by appellant, are distinguishable on their facts.

In *Crow,* a sheriff confronted the appellant at a public dance. After forming the opinion that the appellant was intoxicated, the sheriff gave him the option of going home or going to jail. Then, the sheriff grabbed him on the shoulder and a scuffle ensued in which Crow allegedly pulled at the sheriff's pistol. *Id.* 216 S.W.2d at 202–203. Unlike this case, Crow was never told he was under arrest, nor was he handcuffed. On these facts, the court reversed the conviction.

As we read *Crow,* the primary reason for reversal was that the sheriff had no authority to arrest the appellant and thus was not acting "in the lawful discharge of the duties of his office." *Id.* 216 S.W.2d at 203. In *Gonzalez v. State,* 574 S.W.2d 135, 137 (Tex. Cr.App.1978), we pointed out that *Crow* is no longer viable on this point: a conviction under 22.02(a)(2) does not depend on whether the arrest was legal, or on the defendant's belief about its legality. In this case, of course, appellant is not making any such claim.

Secondly, however, *Crow* also seems to stand for the proposition that not only must a peace officer be acting in the lawful discharge of his duties, but that the defendant must be aware of that fact. Under the 1925 Penal Code, Article 1147, Subdivision 1 provided that an assault was aggravated when "committed upon an officer in the lawful discharge of the duties of his office, *if it was known or declared to the offender* that the person assaulted was an officer *discharging an official duty." Crow,* supra, 216 S.W.2d at 202. (Emphasis supplied) In *Crow,* however, the court noted that there was no "evidence from any source" that Crow knew or had been informed that the sheriff "was an officer *in the discharge of an official duty." Id.* 216 S.W.2d at 203. (Emphasis supplied) Although such language was dicta, it seems that under the old Penal Code, the State had to show not just that the defendant knew he was assaulting a peace officer, but that he *knew* the officer was at that very time "discharging an official duty." *See Thompson v. State,* 426 S.W.2d 242, 243 at n. 1 (Tex.Cr.App.1968).

Under the current Penal Code, however, no such requirement exists. Section 22.02(a)(2)(A) provides:

"A person commits an offense if he commits assault as defined in Section 22.01 of this code and he:

\* \* \* \* \* \*

(2) causes bodily injury to a peace officer when *he knows or has been informed the person assaulted is a peace officer:*

(A) while the peace officer is lawfully discharging an official duty;" (Emphasis supplied)

The plain meaning of Section 22.02(a)(2)(A) is that while the State must still prove the defendant knew or had been informed that he was assaulting a *peace officer,* proof that he also knew the officer was "lawfully discharging an official duty" is unnecessary.

---

1. Penal Code § 6.03(b). A person acts knowingly ... with respect to ... circumstances surrounding his conduct when he is aware ... that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is *reasonably* certain to cause the result. (Emphasis supplied)

Because of the difference in language between the 1925 code and the present code, *Crow* is no longer authoritative on this point, and we so hold. Accordingly, appellant's reliance on *Crow* is misguided.[2]

 In *Franklin,* the defendant had been set upon by three or four civilians and was busy defending himself when a deputy sheriff came along and joined the fray. As the court put it, Franklin apparently mistook the deputy sheriff for "another 'Richmond in the field,' come to swell the ranks, and take part with his assailants."[3] *Id.* at 11 S.W. 35. In this case, by contrast, the evidence does not disclose any civilians aiding in the arrest, and appellant's testimony does not even hint at the possibility that he believed a layman had pitched in, or that he was uncertain of the status of the person he

bit.[4] Instead, the evidence shows that when appellant bit Officer Spradling on the finger, he knew full well he was biting the hand that was arresting him.

The judgments of the trial court are affirmed.

2. Appellant merely cites *Crow* as authority that the defendant must know that the person assaulted is a peace officer. As we have indicated, we do not believe this was the precise question in that case. Even if it had been, we think the facts of this case are sufficiently distinguishable.

3. The "Richmond" allusion is to Shakespeare's *King Richard III,* Act V, scene IV, lines 11–12. Military strategy of old dictated that a high-ranking figure like Richmond be protected by garbing him and several ordinary soldiers identically, so that an adversary had to hack through them to be certain of finding the real

"Richmond." Although appellant here was apparently not seeking any particular Richmond to bite, all of his Richmonds were police officers, unlike Franklin's.

4. It is true that the evidence does not reveal whether Spradling was in uniform. In view of appellant's testimony, however, we do not deem proof of this essential. In the future we invite the State's attention to Penal Code § 22.02(b), since a thorough reading of the transcript does not reveal whether Officer Spradling was in uniform or in plain clothes.