ACCEPTED
04-15-00289-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
11/9/2015 2:43:45 PM
KEITH HOTTLE
CLERK

**NO. 04-15-00289-CR**

**IN THE COURT OF APPEALS**

**FOR THE**

**FOURTH COURT OF APPEALS DISTRICT**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

11/9/2015 2:43:45 PM

KEITH E. HOTTLE
Clerk

**OF TEXAS**

**SAN ANTONIO, TEXAS**


**RODNEY JOE GARRETT,**
**Appellant**


**VS.**


**THE STATE OF TEXAS,**
**Appellee**


**Trial Cause No. 2014-CR-3151**
**Appeal from the 187th District Court**
**Bexar County, Texas**
**Hon. Steven C. Hilbig, Presiding**


**BRIEF FOR APPELLANT**


                        **MICHAEL D. ROBBINS**
                        **Assistant Public Defender**
                        **Paul Elizondo Tower**
                        **101 W. Nueva St., Suite 370**
                        **San Antonio, Texas 78205**

**ORAL ARGUMENT**         **(210) 335-0701**
**NOT REQUESTED**        **FAX (210) 335-0707**
                        **mrobbins@bexar.org**
                        **Bar No. 16984600**


                        **ATTORNEY FOR**
                        **APPELLANT**

i

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a) (West 2015), the parties to this suit are as follows:

(1)     **RODNEY JOE GARRETT**, TDCJ #02006370, Garza East Transfer Facility, 4304 Highway 202, Beeville, Texas 78102, is the appellant and was the defendant in trial court.

(2)     The **STATE OF TEXAS**, by and through the Bexar County District Attorney's Office, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205, is the appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1)     Rodney Joe Garrett was represented by **CHARLES BUNK** and **KELLY McGINNIS,** 130 E. Travis St., Suite 435, San Antonio, Texas 78205.

(2)     The State of Texas was represented by **NICHOLAS LAHOOD,** District Attorney, and **CARRIE MOY** and **CLARISSA FERNANDEZ,** Assistant District Attorneys, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205.

The appellate attorneys are as follows:

(1)     Rodney Joe Garrett is represented by **MICHAEL D. ROBBINS**, Assistant Public Defender, Paul Elizondo Tower, 101 W. Nueva St., Suite 370, San Antonio, Texas 78205.

(2)     The State of Texas is represented by the **BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE**, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205.

The trial judge was **HON. STEVEN C. HILBIG,** 187th District Court, Cadena-Reeves Justice Center, 300 Dolorosa St., 2nd Floor, San Antonio, Texas 78205. There was also a pre-trial competency hearing, not relevant to this appeal, heard by **HON. ANDREW CARRUTHERS**, Criminal Law Magistrate, Cadena-Reeves Justice Center, 300 Dolorosa St., 2nd Floor, San Antonio, Texas 78205.

# Table of Contents

                                                                    Page

Identity of Parties and Counsel . . . . . . . . . ii

Table of Contents . . . . . . . . . . iv

Table of Authorities . . . . . . . . . . vi

A Note Regarding Record References . . . . . . . . viii

Statement Regarding Oral Argument . . . . . . . . viii

Statement of the Case . . . . . . . . . 1

Issues Presented . . . . . . . . . . 2

### APPELLANT'S FIRST POINT OF ERROR
The evidence was legally insufficient to support the conviction for aggravated assault on a public servant, because the evidence does not support the finding that Mr. Garrett intentionally or knowingly threatened imminent bodily injury to Detective Crawford.

### APPELLANT'S SECOND POINT OF ERROR
The trial court erred when it overruled Mr. Garrett's objection to the jury instruction containing a presumption suggesting that Mr. Garrett knew that Deputy Crawford was a public servant, because there was no evidence that the deputy was wearing a distinctive police uniform or badge. (RR 8, 125, 129).

### APPELLANT'S THIRD POINT OF ERROR
The trial court erred when, in the punishment phase, it sustained the State's relevance objections to questions to Mr. Garrett's mother Laurie Lee, because the questions were helpful to the jury in determining the appropriate punishment. (RR 9, 69-71).

Statement of Facts . . . . . . . . . . 3

Summary of the Argument . . . . . . . . 18

Argument   .     .     .     .     .     .     .     .     .     .     20

Appellant's First Point of Error (Restated)   .     .     .     .     .     20

Appellant's Second Point of Error (Restated)     .     .     .     27

Appellant's Third Point of Error (Restated)   .     .     .     .     .     31

Conclusion and Prayer   .     .     .     .     .     .     .     .     .     35

Word Count Certificate of Compliance     .     .     .     .     .     .     36

Certificate of Service   .     .     .     .     .     .     .     .     .     36

# Table of Authorities

Page

## Constitution

U.S. CONST. amend. XIV . . . . . . . . . 21

## Statutes

TEX. CODE CRIM. PROC. art. 37.07 (West 2006) . . . . . 33

TEX. CODE CRIM. PROC. art. 44.29 (West 2006) . . . . . 35

TEX. PENAL CODE § 2.05 (West 2011) . . . . . . . 29

TEX. PENAL CODE § 6.03 (West 2011) . . . . . . . 21

TEX. PENAL CODE § 22.01 (West 2011) . . . . . .20,21

TEX. PENAL CODE § 22.02 (West 2011) . . . . . 1,20,21,28

## Rules

TEX. R. APP. P. 9.4 (West 2015). . . . . . . . 36

TEX. R. APP. P. 38.1 (West 2015) . . . . . . . ii

TEX. R. APP. P. 44.2 (West 2015) . . . . . . . 27

TEX. R. EVID. 401 (West 2015) . . . . . . . . 34

## Cases

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) . . . 30

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) . . . . 22

*Conner v. State*, 67 S.W.3d 192 (Tex. Crim. App. 2001) . . . . 22

*Cooks v. State*, 844 S.W.2d 697 (Tex. Crim. App. 1992) . . . . 34

*Ellison v. State*, 201 S.W.3d 714 (Tex. Crim. App. 2006) . . . . 34

*Flanagan v. State*, 675 S.W.2d 734 (Tex. Crim. App. 1984) . . . 22

*Garcia v. State*, 239 S.W.3d 862 (Tex. App. – Houston [1st Dist.] 2007, pet. ref'd) . . . . . . . . . . . . 34

*Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001) . . . .26,27

*Hutch v. State*, 922 S.W.2d 166 (Tex. Crim. App. 1996) . . . . 30

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . 21

*Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996) . . . . 22

*Lamb v. State*, 186 S.W.3d 136 (Tex. App. – Houston [1st Dist.] 2005, no pet.) . . . . . . . . . . . . . 33

*Mayer v. State*, 309 S.W.3d 552 (Tex. Crim. App. 2010) . . . . 20

*Nicholas v. State*, No. 04-07-00499-CR, 2008 Tex. App. LEXIS 5981, 2008 WL 3057842 (Tex. App. – San Antonio Aug. 6, 2008, no pet.)(mem. op., not designated for publication) . . . . . . .33,34

*Payne v. State*, 596 S.W.2d 911 (Tex. Crim. App. 1980) . . . . 28

*Salazar v. State*, 643 S.W.2d 953 (Tex. Crim. App. 1983) . . . . 28

*Stogiera v. State*, 191 S.W.3d 194 (Tex. App. – San Antonio 2005, no pet.) . 22

*Ulster County Court v. Allen*, 442 U.S. 140 (1979) . . . . . 29

*Willis v. State*, 790 S.W.2d 307 (Tex. Crim. App. 1990) . . . . 29

## A Note Regarding Record References

There are 10 sequentially-numbered volumes in the reporter's record of the trial and suppression hearing, as well and an additional volume by a swing reporter containing the ruling on the motion to suppress, and a volume from the mental health hearing in the Magistrate's Court. In this brief, references to the 10 numbered volumes will be thus: (RR 3, ___). References to the volume by the swing reporter, Kayleen Rivera, will be thus: (RR KR 4/16/15, ___). The Magistrate's Court volume is not relevant to this appeal. References to the clerk's record will be thus: (CR, ___). The names of the testifying witnesses will appear in **bold type** at the beginning of the summary of their testimony.

## Statement Regarding Oral Argument

The issues raised in this appeal may be determined from the record and legal authorities alone. For that reason, the undersigned counsel does not request oral argument, but will present oral argument if it is requested by the State and granted by the Court.

TO THE COURT OF APPEALS FOR THE FOURTH COURT OF APPEALS DISTRICT OF TEXAS:

This brief is filed on behalf of Appellant, Rodney Joe Garrett, by Michael D. Robbins, Assistant Public Defender.

## Statement of the Case

Appellant Rodney Joe Garrett was charged by indictment with the offense of aggravated assault on a public servant, with a deadly weapon.[1] (CR, 6). A jury was sworn (RR 5, 162), and Mr. Garrett pleaded not guilty. (RR 6, 13). Following evidence and arguments of counsel, the jury found Mr. Garrett guilty of aggravated assault on a public servant, with a deadly weapon. (CR, 96; RR 8, 156-156). Mr. Garrett elected that the jury assess punishment in case of conviction. (CR, 84). The jury assessed a sentence of 34 years' confinement, with no fine (CR, 112; RR 9, 96), and the trial court sentenced accordingly (CR, 114-115; RR 9, 100-101). The court certified that this is not a plea bargained case and that Mr. Garrett has the right of appeal. (CR, 113). Mr. Garrett timely filed a notice of appeal. (CR, 116). This appeal follows.

---

[1] A felony of the first degree, in violation of TEX. PENAL CODE §§ 22.02(a)(2) & (b)(2)(A) (West 2011). The indictment also contained a count alleging attempted capital murder, but this count was waived by the State. (RR 5, 11).

## Issues Presented

### Appellant's First Point of Error

The evidence was legally insufficient to support the conviction for aggravated assault on a public servant, because the evidence does not support the finding that Mr. Garrett intentionally or knowingly threatened imminent bodily injury to Detective Crawford.

### Appellant's Second Point of Error

The trial court erred when it overruled Mr. Garrett's objection to the jury instruction containing a presumption suggesting that Mr. Garrett knew that Deputy Crawford was a public servant, because there was no evidence that the deputy was wearing a distinctive police uniform or badge. (RR 8, 125, 129).

### Appellant's Third Point of Error

The trial court erred when, in the punishment phase, it sustained the State's relevance objections to questions to Mr. Garrett's mother Laurie Lee, because the questions were helpful to the jury in determining the appropriate punishment. (RR 9, 69-71).

## Statement of Facts[2]

**Prelude: security videos at South Park Mall.**

**Paul Rosas** was the security director of South Park Mall in San Antonio. (RR 6, 20). He reviewed surveillance video made at the mall on February 11, 2014. (RR 6, 20-21). The footage showed a truck coming onto the mall property from Military Drive. The driver got out of the truck and ran toward Bealls. (RR 6, 23). **Ramiro Palacios**, the manager of Bealls, burned a CD of security video from the store's internal security cameras that same day. (RR 6, 56-57). **Matthew Van Auken**, the loss prevention officer from the Sears store in the mall, searched his store's surveillance videos from that day and and found a video showing a semi-truck (hereafter, "semi") that entered the parking lot without a trailer and smashed into cars parked in the lot. (RR 6, 76-77).

**A police chase leads to South Park Mall.**[3]

**John Aguillon** was a deputy with the Bexar County Sheriff's Office ("BCSO"). On February 11, 2014, he was on duty, in uniform, and driving a marked patrol vehicle. (RR 6, 88). He was patrolling the area around Marbach Road and Loop 1604 when a call came in for a vehicle theft in progress. (RR 6, 89). He proceeded to Loop 410 and Old Pearsall Road, heading southbound. He

---

[2] This brief will summarize the testimony as given at trial. Appellant does not concede that the State's evidence is true.

[3] The route of this long chase may be seen on a map admitted into evidence. (RR 10, SX23).

saw a white semi going northbound, with BCSO Deputy Derrick Crawford in pursuit. Deputy Aguillon turned around and joined in the pursuit, at Loop 410 and Valley Hi Drive. (RR 6, 90). Deputy Crawford was also driving a marked patrol vehicle, with overhead lights flashing. The semi they were pursuing was just a cab. (RR 6, 91). The pursuit proceeded onto U.S. Highway 90 eastbound. (RR 6, 92). The three vehicles were driving at about 90 MPH. It was about 1:00 PM, and traffic on the highways was moderate. (RR 6, 93).

Deputy Aguillon radioed to Deputy Crawford that he would "call the chase," meaning that he would report their location to the BCSO dispatcher. They were all in the center lane. Soon, San Antonio Police Department ("SAPD") units joined in the pursuit. (RR 6, 94). Deputy Aguillon became aware that weapons were being fired when Deputy Crawford radioed, "He's shooting at me. He fired one round. Shots fired with a long arm." (RR 6, 95). Deputy Crawford first said this at Loop 410 and Valley Hi Drive, and he stated that shots had been fired four distinct times. (RR 6, 95-96). The semi changed from one lane to another during the chase, dodging traffic. Drivers were stopping in the middle of the highway. (RR 6, 97). The driver of the semi exited the highway three times, driving on the access road before getting back on the highway. The driver ran through traffic signals at intersections on the access road. (RR 6, 98). He did not strike any vehicles, but he ran some off the road. (RR 6, 99).

The semi exited form Highway 90 at I-35 and went southbound. (RR 6, 100). He stayed on I-35 for about five miles, until Military Drive, although he exited the freeway onto the service road and ran stop lights at Theo Avenue and Malone Avenue. He exited the freeway at a place where there was no exit ramp. After running the lights, the driver got back on I-35. (RR 6, 101). Deputy Aguillon had his overhead lights, air horn, and siren going. All officers involved in the chase had their overheads going. (RR 6, 103).

The semi exited I-35 at Military Drive. (RR 7, 7). The driver had lost but regained control of the semi while still on the freeway. (RR 7, 8) Because of traffic back-up at the Military Drive intersection, the semi got into the far left lane of the service road and got onto Military Drive by driving over a median and turning onto Military. Deputy Aguillon followed the semi, followed by other officers. (RR 7, 9). The semi drove on Military Drive toward Zarazamora Street, running a traffic signal and almost colliding with a vehicle at the light. (RR 7, 10). The semi jumped the center median on Military and entered the South Park Mall parking lots just east of Zarzamora. (RR 7, 11).

Deputy Aguillon turned onto Zarazmora and drove parallel to the route of the semi. (RR 7, 11-12). The semi made a U-turn in the parking lot and drove nearer to the mall. Deputy Aguillon turned into the mall lot in the area near the Sears store. (RR 7, 13). The deputy saw the driver of the semi slow down, open the

5

door, and jump out. (RR 7, 14). The semi kept rolling. Deputy Aguillon lost sight of the semi driver for second, but then saw him pop up and start running. (RR 7, 15). The driver ran northward, toward Deputy Aguillon's patrol car, which was just south of Bealls. (RR 7, 16). The driver of the semi ran between cars on the lot and made a couple of turns. Deputy Aguillon lost sight of him briefly, but the man popped up right in front of the deputy's car. The man, who did not have anything in his hands, ran toward Bealls. Deputy Aguiillon got out of his car and followed the man, yelling, "Stop. Police. Stop. Stop." He did not know whether the man was armed, and he worried that the man could take hostages. (RR 7, 17).

Deputy Aguillon drew his service pistol. (RR 7, 18). They both ran toward, and into, Bealls. The deputy lost sight of the man inside the store. (RR 7, 19). Back-up officers followed Deputy Aguillon into the store, and the deputy heard one of them say, "Let me see your hands." The deputy ran toward the voices, and he saw the man lying down, with two officers attempting to pull his hands from beneath him. (RR 7, 20). The officers placed the man in custody and led him out of the store. (RR 7, 21). The officers took the man to Deputy Aguillon's patrol car. The deputy asked the man for identifying information. (RR 7, 23). The man complained about his left knee, and Deputy Aguillon called EMS. (RR 7, 25). Deputy Aguillon identified Rodney Joe Garrett in court as the driver of the semi. (RR 7, 68).

**Bobby Garza** was a BCSO deputy, who heard about the chase on the radio and proceeded to follow it to the mall. (RR 7, 70). When he got to the mall, Mr. Garrett was already in custody. (RR 7, 71). Deputy Garza was assigned to stand watch over Mr. Garrett, who was already in Deputy Aguillon's vehicle. (RR 7, 72). After about 15 minutes, Deputy Garza transferred Mr. Garrett to his own vehicle, for transport to the magistrate's office. (RR 7, 73). Mr. Garrett was in Deputy Garza's back seat, and the deputy got into the driver's seat. He was not having any conversation with Mr. Garrett. (RR 7, 74). Mr. Garrett said something spontaneously. He said he was sorry for shooting at the deputies. He said the only reason that he did it was so that they would get scared and stop the chase. RR 7, 75). Mr. Garrett did not say anything else to Deputy Garza. (RR 7, 76).

BCSO Deputy **Manuel Herrera** was working in a traffic unit on February 11, 2014 and was dispatched to the area around Highway 90 and Cupples Road. (RR 7, 91). He was aware that someone driving a stolen semi was shooting at the police, and he positioned himself at a location where he anticipated the chase would pass. (RR 7, 92). He was carrying a service pistol in his belt, and also had a Benelli AR-15 rifle in his patrol vehicle. (RR 7, 93). When the semi passed through the U.S. 90/Cupples intersection, Deputy Herrera got his rifle and fired several at the driver of the semi. (RR 7, 94). He fired three or four shots, which probably struck the semi. He announced this over police radio, and then joined in

the chase. (RR 7, 95). He felt he was justified in using deadly force under the circumstances. Deputy Herrera's patrol vehicle had video capability. (RR 7, 95). A DVD video of him firing the shots and then joining the pursuit was admitted into evidence and played for the jury. (RR 7, 98-100; RR10, SX24).

Several BCSO investigators testified about taking photos, making videos, and securing physical evidence in the parking lot of South Park Mall. *See generally* (RR 7, 129 – 207). The details of their testimony are not relevant to the issues in this appeal, so this brief will discuss only the physical evidence collected. The various photos and videos are contained in the exhibits volume of the record. Investigator **Jason Tibbs** found three spent .410 shotgun shells in the cab of the semi, as well as seven live rounds. He also found six live rounds in the parking lot, within 20 or 30 feet of the shotgun[4] and within 300 feet of the semi. (RR 7, 149-150). He also collected a live round from the barrel of the shotgun. (RR 7, 171-172; RR 10, SX47). Investigator **Janice Henry** collected a gunshot residue ("GSR") kit from Mr. Garrett.[5] (RR 7, 188).

BCSO Investigator **Jennifer Baeza** was the lead investigator of the case. (RR 7, 212). When she arrived at the mall, she questioned officers at the scene about what happened, and they pointed out Mr. Garrett, who was in custody in a

---

[4] The weapon was a shotgun rather than a rifle. (RR 7, 176).
[5] **Christina Vachon**, a forensic scientist at the Bexar County Crime Lab, tested the GSR kits and found that Mr. Garrett may have discharged a firearm, handled a discharged firearm, or been in close proximity to a discharging firearm. (RR 8, 59).

patrol vehicle. She spoke briefly with Mr. Garrett. (RR 7, 213). Investigator Baeza directed investigators where to take photos and to collect evidence (RR 4, 214-215). She also processed the secondary scene on Cupples Road. (RR 7, 215). She requested that the shotgun be tested by the Crime Lab,[6] and she directed that the GSR kit be taken. (RR 7, 217-218).

Deputy Baeza spoke with Mr. Garrett at length the following day. (RR 7, 219). The investigator read Mr. Garrett his rights, and he indicated that he understood his rights and signed off on the form. (RR 7, 220; RR 10, SX59). The interview took place in an interview room at the jail. No one else was present. The interview was recorded. (RR 7, 223). Investigator Baeza made no threats or promises to Mr. Garrett. She did not use coercive tactics and did not deny him any basic necessities. Mr. Garrett at no time indicated that he wanted to end the interview. (RR 7, 224-225).

During the interview (RR 10, SX60), Mr. Garrett was forthcoming. He admitted to driving the semi, which was verified as stolen. He admitted that he had recently used methamphetamines prior to the chase. He admitted that the narcotics and paraphernalia found inside the semi were his. (RR 3, 228). He purchased the shotgun shells at Wal-Mart and he pawned items stolen from a different trailer

---

[6] **Edward Wallace**, the firearm supervisor at the Crime Lab, testified that that three spent shells were fired from the shotgun found at the scene. (RR 8, 11).

to get money to purchase the shotgun shells. (RR 3, 229). The shotgun was also stolen from the other trailer. (RR 7, 254). Mr. Garrett stated that the whole crime spree lasted four days. (RR 7, 230).

SAPD Officer **Mark Gallardo** was in the area when he heard an emergency tone about a police chase and shots being fired at an officer. He went to Highway 90 and saw an officer in pursuit of a semi. (RR 8, 25). He caught up with the two deputies in pursuit at Highway 90 and Acme Road, and joined the chase. (RR 8, 26). His patrol car was equipped with a COBAN camera system. (RR 8, 27). He described the situation as scary, because the roads were wet that day and there was a lot of traffic. (RR 8, 28). During the chase, Officer Gallardo saw the semi driver pointing a weapon at pursuing officers. They were driving about 90 MPH. (RR 8, 29). The COBAN video was admitted into evidence and played for the jury, without the sound track. (RR 8, 34; RR 10, SX64). Officer Gallardo was one of many officers who pursued the semi to South Park Mall. He and two BCSO deputies followed Mr. Garrett into Bealls and apprehended him. He resisted somewhat, and the officers did not know whether or not he was armed. The BCSO deputies subdued and cuffed Mr. Garrett. Then they picked him up, searched him and escorted him from the store. (RR 8, 44-45).

**The genesis of the pursuit.**

**Derek Branning** was driving home on I-35 on February 11, 2014 when he saw a semi that looked like one stolen from the work yard of his employer, Great Southwestern Construction, in Devine. (RR 8, 62-63). The semi was stolen a couple of weeks earlier. (RR 8, 63-64). When he saw the semi, it was heading north approaching the Bexar County line. Mr. Branning verified that it was the company truck, and called 9-1-1. (RR 8, 65). He remained on the phone, giving his location, until officers arrived. They continued northward on I-35 until the Loop 410 interchange, and Mr. Branning stayed with the semi for a few miles on Loop 410. (RR 8, 66). The semi was driving normally at first. However, when the officers arrived, the semi pulled over to the side and then took off, driving across the median and not using exit ramps. It was dangerous and erratic driving. (RR 8, 67). Mr. Branning saw only one officer involved at the start of the chase. The officer was in a marked patrol car. Mr. Branning broke off from the chase when the 9-1-1 dispatcher told him to. (RR 8, 68).

**Derrick Crawford** was a BCSO deputy, and was the named complainant in the case. (CR, 9; RR 8, 70). He was working radar on Kinney Road when he got a dispatch for a vehicle theft in progress. (RR 8, 71). He planned to stop the semi and determine whether or not it was stolen. (RR 8, 73). He first encountered the semi at the I-35/Loop 410 interchange. He also saw Derek Branning's "chase" vehicle, a pickup truck with hazard lights on. They were going over Quintana Road on Loop

410. (RR 8, 74). Deputy Crawford proceeded onto Loop 410 and caught up with the semi at Pearsall Road. He pulled up beside of the chase vehicle, and the driver waved him toward the semi. (RR 8, 75). He passed the chase vehicle and moved to the outside lane behind the semi, activating his red and blue emergency lights to get the driver's attention. The semi pulled over, as if the stop, but then accelerated and went to the right down a small ditch, crossing the grassy median onto the access road. (RR 8, 76).

Thus began the chase. The semi continued on the access road, while Deputy Crawford remained on Loop 410 until the Ray Ellison Drive exit, where he exited and got behind the semi. The semi ran the stop signs at the Ray Ellison intersection. (RR 8, 77). After crossing Ray Ellison, the semi drove over the grassy median back onto Loop 410. Deputy Crawford entered the Loop using the on-ramp. (RR 8, 78). The deputy was driving a marked patrol car. As they approached Valley Hi Drive, the semi slowed down. The driver's side door opened, and the driver stepped out of the cab and leaned around the cab. (RR 8, 79). The driver extended his arm in the direction of Deputy Crawford, and the deputy saw a long gun or rifle. He was two or two and a half car lengths behind the semi. He applied his brakes, leaned over the center console, and saw a muzzle flash. He felt scared and threatened. (RR 8, 80).

Deputy Crawford feared that he would be shot, and injured or killed. The driver shot at him one time at that location. The deputy heard what sounded like shotgun pellets hitting his vehicle and windshield. He rose up and saw the driver of the semi re-enter the cab and accelerate. Deputy Crawford continued the pursuit. (RR 8, 81). The semi moved to the outside lane of Loop 410, as if to exit to Valley Hi and Highway 90. Deputy Crawford followed him. (RR 8, 82). However, due to traffic congestion on the exit ramp, the deputy stayed on Loop 410. Around this time, Deputy Aguillon came up behind him. (RR 8, 83). Deputy Crawford became the lead vehicle in the pursuit, and handled the radio transmissions (until Deputy Aguillon started the "call the chase"). (RR 8, 84).

As they neared Highway 90, the semi cut across the median onto the access road leading to the eastbound Highway 90 access road. (RR 8, 85). Deputy Crawford pursued the semi onto the Highway 90 access road, with lights and siren going. They neared the exit ramp to Military Drive, and the semi slowed down. (RR 8, 86). The back window of the semi had fallen out, and the driver stuck the long gun out of the back window and fired another shot. (RR 8, 87). Deputy Crawford felt threatened. He leaned back over the center console and used his computer as a shield. He did not see a muzzle flash this time, but heard pellets strike his vehicle. He rose and saw the semi accelerate and cross the grassy median. The semi struck a sign and re-entered Highway 90. (RR 8, 88).

13

Deputy Crawford was concerned that the semi would strike a vehicle on the highway, and continued the pursuit. At one point, he was driving at 85 to 90 MPH. (RR 8, 89). The semi drove from lane to lane on the highway. As they passed Old Highway 90, the semi slowed down again and the driver fired again through the rear window. Deputy Crawford leaned over the console and shielded himself with his computer. (RR 8, 90). He did not see the muzzle flash, but he heard pellets striking his vehicle. (RR 8, 90-91). The semi accelerated on Highway 90, weaving in and out of traffic. Drivers on the road were moving to get out of the way. By this time, more officers were involved in the chase. (RR 8, 91).

The semi left the highway at Callaghan Road. The driver tossed something out the window as he was going down the exit ramp. The semi went through a red light at Acme Road, where there were vehicles stopped at the intersection. (RR 8, 92-93). The semi stayed on the access road toward 36th Street, where he crossed the median and got back on the highway. Once he was back on Highway 90, the semi again weaved in and out of traffic. (RR 8, 93). The semi left the highway, via the grassy median, near Gen. McMullen and Cupples. (RR 8, 94). The drive began to slow down, and fired a fourth shot. (RR 4, 94-95). As before, Deputy Crawford slowed down and lowered himself over center the console. He again heard pellets strike his vehicle. (RR 8, 95).

The semi remained on the access road through Gen. McMullen and Cupples. Deputy Crawford slowed down as they neared Cupples, so that they could clear the intersection safely. Then he re-entered Highway 90, and Deputy Aguillon became the primary pursuit vehicle. (RR 8, 96). Deputy Crawford got behind Deputy Aguillon and began calling the chase. (RR 8, 97). Each time the driver of the semi fired at him, Deputy Crawford broadcast that shots were fired. When they all got back on the freeway, the semi continued to weave, and they reached speeds of 90 to 95 MPH. The roads were wet and slippery. (RR 8, 98-99).

By this time, there were more officers in pursuit of the semi. They all proceeded east on Highway 90 until they reached I-35 south, where the semi exited. (RR 8, 99). The semi cut across a concrete ditch and got onto the I-35 service road, proceeding through the Theo and Malone intersections. Then the semi cut across and exit ramp and re-entered I-35. He slid into a retaining wall near Division Avenue. (RR 8, 100). He regained control of the semi and continued southward, cutting across lanes and taking the Military Drive exit. The chase had gone on for 15 to 20 miles. (RR 8, 101). The semi cut across a median to gain access to Military drive, heading west toward Zarzamora Street. and turning into South Park Mall. (RR 8, 102). As the semi approached the Sears store, the driver's side door opened and the driver jumped from the semi. He slipped on the ground and lost his shotgun, but he got back up and ran toward Bealls. (RR 8, 103).

The driver tried without success to pick up the shotgun. He ran directly in front of Deputy Crawford's patrol car, which struck the driver. The driver stumbled but kept running. (RR8, 104). The suspect ran into Bealls, and Deputy Crawford stopped his patrol car and pursued on foot. (RR 8, 105). Deputies Crawford and Aguillon, along with an SAPD officer,[7] began canvassing the store. (RR 8, 106). They found the suspect underneath some clothing behind a display rack. The suspect was in a fetal position. Deputy Crawford grabbed the suspect, took him to the floor, and began to place him in handcuffs. (RR 8, 107). Deputy Crawford identified Rodney Joe Garret as the person he was testifying about. (RR 8, 108). Mr. Garrett refused to cooperate, and the officers had to carry him out of the store. (RR 8, 109).

**The verdict of conviction, punishment phase, and post-conviction proceedings.**

Following the close of evidence and argument of counsel, the jury convicted Mr. Garrett of aggravated assault on a public servant, with a deadly weapon. (CR, 96; RR 8, 156-157). Mr. Garrett elected that the jury assess punishment in case of conviction. (CR, 84). The issue in the punishment hearing that is relevant to this appeal will be discussed in detail in Appellant's Third Point of Error, below. The jury assessed a sentence of 34 years, with no fine (CR, 112; RR 9, 96), and the trial sentenced Mr. Garrett accordingly. (CR, 114-115; RR 9, 100-101). The trial court

---

[7] Mark Gallardo. (RR 8, 34).

certified that this not a plea bargained case and that Mr. Garrett has the right to appeal. (CR, 113). Mr. Garrett timely filed notice of appeal. (CR, 116). The trial court appointed the Bexar County Public Defender's Office to represent Mr. Garrett on appeal. (CR, 117). This appeal follows.

## Summary of the Argument

**First Point of Error.** When reviewing a legal sufficiency of the evidence claim in a criminal case, the appellate court will look at the evidence in a light favorable to the verdict, and will determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. In this case, no rational trier of fact could have found beyond a reasonable doubt that Rodney Joe Garrett committed the offense of aggravated assault on a public servant. The evidence was insufficient to show that Mr. Garrett had either of the required culpable mental states.

**Second Point of Error.** Over objection by the defense, the trial court charged the jury on the statutory presumption that Mr. Garrett knew that Deputy Crawford was a public servant if the deputy was wearing a distinctive uniform or badge. Although this was only a permissive presumption, it was not appropriate in this case, because there was no evidence presented that Deputy Crawford wore a distinctive uniform or badge at the time Mr. Garrett shot at him.

**Third Point of Error.** At the punishment phase, defense counsel attempted to ask Mr. Garrett's mother questions regarding her feelings about his punishment. The State objected on relevance grounds, and the objections were sustained. The trial court erred when it sustained these objections, because the questions were

relevant to punishment, in that they were helpful to the jury in determining punishment.

## Argument

## Appellant's First Point of Error (Restated)

The evidence was legally insufficient to support the conviction for aggravated assault on a public servant, because the evidence does not support the finding that Mr. Garrett intentionally or knowingly threatened imminent bodily injury to Detective Crawford.

A challenge to the legal sufficiency of the evidence need not be preserved at trial, and may be raised for the first time on appeal. *Mayer v. State*, 309 S.W.3d 552, 555 (Tex. Crim. App. 2010). However, defense counsel was aware that the evidence of intentionally or knowingly threatening bodily injury was lacking, as is apparent from his jury argument, "Right now is one thing: Did he intentionally or knowingly threaten bodily injury?" (RR 8, 140).

**Aggravated assault on a public servant.**

Mr. Garrett was indicted in Cause No. 2014-CR-3151 for the offense of aggravated assault on a public servant. (CR, 4). This is a felony of the first degree, in violation of TEX. PENAL CODE §§ 22.02(a)(2) & (b)(2)(B) (West 2011). The jury found Mr. Garrett guilty of the offense, "as charged in the indictment." (CR, 9; RR 8, 156-157).

A person commits the offense of assault if the person intentionally or knowingly threatens another with imminent bodily injury. TEX. PENAL CODE § 22.01(a)(2) (West 2011). As indicted in this case, a person commits the offense of aggravated assault if the person commits the offense of assault as defined in

20

Section 22.01 of the Penal Code, and uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.02(a) (West 2011). Aggravated assault is generally a felony of the second degree, but is a felony of the first degree if it is committed against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty. TEX. PENAL CODE § 22.02(b)(2)(B)(West 2011).

A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. TEX. PENAL CODE § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. TEX. PENAL CODE § 6.03(b) (West 2011).

**Legal sufficiency: the general principles.**

Legal sufficiency of the evidence "is an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia,* 443 U.S. 307, 316 (1979). The standard of review is whether, when viewed in the light most favorable to the prosecution, any rational trier of fact could have found the

21

essential elements of the offense beyond a reasonable doubt. *Id*. at 319; *Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010). The appellate court will consider all evidence admitted, whether proper or improper. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

"The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. [Citation omitted]. Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The trier of fact is free to believe or disbelieve the testimony of any witness. *Flanagan v. State*, 675 S.W.2d 734, 746 (Tex. Crim. App. 1984) (op. on reh'g). Likewise, the jury determines the weight to be afforded contradicting testimony. *Brooks*, 323 S.W.3d at 899; *Stogiera v. State*, 191 S.W.3d 194, 196 (Tex. App. – San Antonio 2005, no pet.).

**Application.**

It is obvious that Mr. Garrett did not intentionally or knowingly threaten Deputy Crawford with bodily. That may be seen from the testimony of the State's own witnesses, and from the interrogation video of Mr. Garrett which was tendered into evidence.

The first iteration of this in front of the jury was in the testimony of Deputy Bobby Garza, who was referring to the period after Mr. Garrett was arrested, while Mr. Garrett was in the back of Deputy Garza's patrol car:

Q.    At some point does he say something to you?

A.    Yes, he does.

Q.    Does he just volunteer that to you?

A.    Yes, he does.

Q.    Would you tell the jury what he told you, please.

[Defense objection overruled]

Q.    Would you tell the jury what the suspect told you?

A.    He apologized. He said he was sorry for what he did, for shooting at Deputies. And the only reason he did that was so they could get scared, you know, and stop the chase. He thought that would scare them.
(RR 7, 75).

Mr. Garrett's true intentions were laid bare during his recorded interview with Investigator Baeza. A redacted version of this interview was admitted into evidence as State's Exhibit 60 during the guilt phase of the trial (RR 7, 220), and an un-redacted version was admitted as State's Exhibit 66 during the punishment phase. (RR 9, 26). This brief will refer to the redacted version, because it was all that the jury saw during the guilt phase. The video is not time-stamped, so this brief will reference the actual timing when played on a computer or DVD player. Because of the redaction, SX60 was divided into several parts. This brief will reference State's Exhibit 60 Part 005 (21,478 KB) and Part 007 (15,634 KB).

Prior to Mr. Garrett's detailed confession, Investigator Baeza complemented his driving ability, saying, "You're pretty good, too." (SX60 Part 005, 00:18). Mr.

Garrett told the investigator that he did not want to get pulled over. He could not "loose" Detective Crawford, and was looking for a way to "shake him," presumably meaning that he was looking for a way to stop the pursuit right after it started. (SX60 Part 005, 01:25). He tried to make sure that all other traffic was not put in harm's way. (SX60 Part 005, 01:37). When he could not "shake" Detective Crawford, "I got the shotgun." (SX60 Part 005, 02:11). He thought that, "If I use the shotgun maybe they'll get scared so much [unintelligible] that they'll stop chasing me" and back off. (SX60 Part 005, 02:53).

Mr. Garrett started crying at this point during the video, and had to regain his composure. He said he cocked the hammer of the shotgun back, leaned out the window and aimed toward the pursuing officer(s), "but I'm not going to shoot at them. I'm not going to shoot directly to kill at all. I shoot above them." This is a technique he learned from his grandfather, who taught him to shoot over the heads of coyotes. (SX60 Part 005, 03:17 – 03:34). Investigator Baez asked him directly, "So you didn't want to kill them?" Mr. Garrett nodded that he did not. (SX60 Part 005, 03:35). He fired the first shot above them officer(s) and slowed down a bit. (SX60 Part 005, 03:40).

Shooting above the officer(s) did not work to scare them off, and they continued the pursuit, so Mr. Garrett shot a second time before they reach Highway 90. (SX60 Part 005, 04:03). Mr. Garrett hung out the window of the semi the first

two times he shot, but not the third time. (SX60 Part 005, 04:08). Instead, he "took out" the back window of the semi, "so I could have a better aim towards the radiator" of the patrol car. (SX60 Part 005, 05:35). His intention was to disable the car by shooting the radiator. (SX60 Part 005, 05:50). When this did not work, Mr. Garrett decided he was done shooting, and his motivation now was only to try to get away. (SX60 Part 005, 06:22). He was aware that he was being shot at by Deputy Manuel Herrera, *see* (RR 7, 95), and he did not want to shoot back, presumably because he did not want to hurt anyone or be hurt or killed himself. (SX60 Part 005, 06:58).

Mr. Garrett went on to describe the remainder of the chase into the South Park Mall parking lot. He recalled that he dropped the gun when he jumped out of the semi. (SX60 Part 005, 14:02). He tried to reach for it, but it was sliding so much in the wet lot that he abandoned the attempt. (SX60 Part 005, 14:15). Investigator Baeza even told Mr. Garrett, "It seems like you didn't want to hurt anybody." (SX60 Part 007, 00:30). "Your intentions, like you told me, were not to hurt them but to scare them to stop chasing you." (SX60 Part 007, 00:45). She also reminded him, however, that he could have killed the officers. (SX60 Part 007, 01:18). Mr Garrett admitted to using "dope" (methamphetamine) 30 minutes before the chase. (SX60 Part 007, 01:55).

It is important to acknowledge that there was no evidence presented which refuted or cast the slightest doubt on Mr. Garrett's confessed motivations for his actions. Furthermore, everything else he told Investigator Baeza on the video was corroborated by the testimony of the various witnesses who took part in the chase and the capture at the mall. There is no reason to doubt anything that Mr. Garrett said regarding his mental state.

He was obviously an experienced driver, and he knew how to shoot a gun. Had he intended to kill or injure Deputy Crawford, he would have aimed lower, and would likely have hit his mark. Instead, he utilized a technique learned from his grandfather and intentionally aimed high. These shots were not the acts of a man who intended to threaten Deputy Crawford with imminent bodily injury. Rather, they were the acts of a man who, irrationally, wanted the deputies to stop following him but without injuring them. He knew what he was doing, and for all the harm he caused, he lacked the necessary intent to commit the crime for which he was indicted and convicted.

**Harm analysis.**

Legal sufficiency of the evidence invokes constitutional issues. *Gollihar v. State*, 46 S.W.3d 243, 245-46 (Tex. Crim. App. 2001). If the record reveals constitutional error that is subject to harmless error review, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines

beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a) (West 2015). The error complained of here contributed to Mr. Garrett's conviction. Indeed, Mr. Garrett could not have been convicted, but for the error. "[T]he remedy for a finding of legally insufficient evidence on appeal is acquittal." *Gollihar v. State*, 46 S.W.3d at 246. Therefore, the judgment of conviction should be reversed, and a judgment of acquittal should be rendered.

## **Appellant's Second Point of Error (Restated)**

> The trial court erred when it overruled Mr. Garrett's objection to the jury instruction containing a presumption suggesting that Mr. Garrett knew that Deputy Crawford was a public servant, because there was no evidence that the deputy was wearing a distinctive police uniform or badge. (RR 8, 125, 129).

The jury charge submitted to the jury contained the following language: "If D. Crawford was wearing a distinctive uniform or badge indicating his employment as a peace officer, the defendant is presumed to have known that D. Crawford was a peace officer. Therefore, if you believe from the evidence beyond a reasonable doubt that D. Crawford, at the time of the assault, if any, was wearing a distinctive uniform or badge indicating his employment as a peace officer, it is presumed, and you may find, that the defendant knew that D. Crawford was a peace officer. However, you are not bound to so find and even if you do so find

27

that State must still prove beyond a reasonable doubt each and all of the elements of the offense charged." (CR, 90). This instruction generally tracks the language of TEX. PENAL CODE § 22.02(c) (West 2011).

During the charge conference, defense counsel objected to the presumption language, because "there is no evidence from Crawford regarding what type of uniform or badge, if any, he was wearing; and, therefore, this presumption that goes to his clothing, it's not proper and should not to be included in the Charge." (RR 8, 124-125). The trial court overruled the objection. (RR 8, 125, 129).

Generally, aggravated assault is a felony of the second degree, but it becomes a felony of the first degree it the assault is committed against a person that the defendant knows is a public servant who is lawfully discharging an official duty. TEX. PENAL CODE § 22.02(b)(2) (West 2011). To establish the more serious offense, the State was required to prove that Mr. Garrett knew that Detective Crawford was a public servant. *Salazar v. State*, 643 S.W.2d 953, 957 (Tex. Crim. App. 1983). The defendant's knowledge that the person assaulted was a public servant is an element of the offense. *Payne v. State*, 596 S.W.2d 911, 913 (Tex. Crim. App. 1980).

The Section 22.02(c) presumption is a permissive presumption. Such a presumption permits, but does not require, the jury to find the elemental fact – that Mr. Garrett knew of Detective Crawford's status as a public servant – upon proof

of the predicate facts, but places no burden on Mr. Garrett to disprove the elemental fact. Because this type of presumption does not alter the State's burden of proof, it is constitutional, provided that the connection between the predicate fact and the elemental fact is rational. *Ulster County Court v. Allen*, 442 U.S. 140, 157 (1979); *Willis v. State*, 790 S.W.2d 307, 310 (Tex. Crim. App. 1990).

Section 2.05 of the Texas Penal Code addresses legal presumptions. When Texas law establishes a presumption with respect to any fact, "if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury, unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact …." TEX. PENAL CODE § 2.05(a)(1) (West 2011). If the existence of a presumed fact is submitted to the jury, Section 2.05(b) sets forth specific language that must be submitted along with the presumption.

The problem in the present case this that there is not "sufficient evidence of the facts that give rise to the presumption." There is no evidence that Deputy Crawford was wearing a distinctive uniform or badge at the time when Mr. Crawford fired at him. There certainly is evidence that Deputy Crawford was driving a marked patrol vehicle, but this fact is not an elemental fact invoking the presumption. It is argued here that the Legislature could have added the driving of a marked police vehicle to the presumption had it intended this fact to be an

elemental fact to support the presumption. However, he Legislature did not add that scenario to the presumption, and the presumption in this case must fail for lack of proof that Detective Crawford was wearing a police badge or uniform at the relevant time.

**Harm.**

In cases of jury charge error, the appellate court first will determine whether error exists. If it does exist, the court determines whether sufficient harm was caused by the error to require reversal. If error was properly preserved, reversal is mandated as long as the error is not harmless. *Hutch v. State*, 922 S.W.2d 166, 170-71 (Tex. Crim. App. 1996) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). In this case, error was preserved because trial counsel objected to the inclusion of the presumption in the charge, and was overruled by the court. The error of the court in overruling the objection was certainly harmful, in that it instructed the jury that it could presume an elemental fact based on insufficient evidence to support that presumption. Mr. Garrett was convicted of a felony of the first degree. His sentence of 34 years was well beyond the top of the second degree felony range. Although he still might have been convicted of the first degree felony, the presumptive language sealed the deal and made his conviction inevitable. He was harmed by the fact that the jury was given the

presumption, which did not apply to him. Mr. Garrett was harmed, and is therefore entitled to a new trial.

### **Appellant's Third Point of Error (Restated)**

The trial court erred when, in the punishment phase, it sustained the State's relevance objections to questions to Mr. Garrett's mother Laurie Lee, because the questions were helpful to the jury in determining appropriate punishment. (RR 9, 69-71).

During the punishment phase of the trial, Mr. Garrett's mother Laurie Lee testified on her son's behalf. Defense counsel asked her several questions to which the State objected on relevance grounds. This led to some prickly interaction between defense counsel and the trial court.

Q.     Okay. When you think about the juror's decision and, you know, what they have to do, what goes through your mind?

MS. MOY:  Objection to relevance

THE COURT:     Sustained.
(RR 9, 69)

*****     *****     *****

Q.     (By Mr. Bunk)  Having heard what you've heard this week, how does it make you feel?

MS. MOY:  Objection to relevance.

THE COURT:     Sustained.

MR. BUNK:     Can we approach?

31

THE COURT:     You can approach.

(Bench Conference.)

MR. BUNK:     I'm sorry, but I absolutely have every right to ask her her thoughts on this process and the punishment process. Why you're not –

THE COURT:     Her –

MR. BUNK:     -- this is beyond me.

THE COURT:     I'm sustaining the objection. You can sit down.

(End of Bench Conference.)

Q.     (By Mr. Bunk)  I can't ask you that' ma'am so I'll move on.

MS. MOY:  Objection to sidebar.

THE COURT:     Counsel. I instructed you to watch your sidebar the other day. Proceed. Ask your next question.

MR. BUNK:     Yes, sir.

Q.     (By Mr. Bunk)  Do you understand why I can't ask you any more questions?

THE COURT:     Counsel, ask a different question.

Q.     (By Mr. Bunk)  Would it surprise you that I can't ask you –

THE COURT:     Counsel, ask a different question.

Q.     (By Mr. Bunk)  Does it hurt you that I can't ask you these question?

MS. MOY:  Objection, Your Honor.

THE COURT:     Counsel.

MR. BUNK:     Yes?

THE COURT: Ask a relevant question.

(RR 9, 70 – 71).

During his final argument to the jury on punishment, defense counsel referenced the objections to the questions he was not permitted to ask, which precipitated further objections by the State and cautionary instructions from the court. (RR 9, 84).

**Relevance at the punishment phase.**

An appellate court reviews a trial court's order excluding evidence for abuse of discretion. *Torres v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2002). It will not reverse an admissibility decision unless it fall outside the zone of reasonable disagreement. *Id.*

TEX. CODE CRIM. PROC. art. 37.07, § 3(a) (West 2006) governs the admissibility of evidence at the punishment phase of a trial. Section 3(a)(1) provides, in pertinent part: "[E]vidence may be offered by the state or the defendant as to any matter the court deems relevant to sentencing …." The court has broad discretion in determining admissibility of punishment phase evidence. *Lamb v. State*, 186 S.W.3d 136, 141 (Tex. App. – Houston [1st Dist.] 2005, no pet.). Unlike at the guilt phase of a trial, "the question at punishment is not whether the defendant had committed a crime, but instead what sentence should be assessed." *Nicholas v. State*, No. 04-07-00499-CR, 2008 Tex. App. LEXIS 5981 at *5, 2008 WL 3057482 (Tex. App. – San Antonio Aug. 6, 2008, no pet.)(mem. op.,

33

not designated for publication)(citing *Ellison v. State,* 201 S.W.3d 714, 718 (Tex. Crim. App. 2006)). Our bifurcated system allows admission of evidence "critical to an enlightened determination of punishment." *Id.* "Generally, the jury is entitled to have before it 'all possibly relevant information about the individual defender whose fate it must determine.'" *Id.* (citing *Cooks v. State*, 844 S.W.2d 697, 735 (Tex. Crim. App. 1992)). "Relevance in [the punishment] context is more a matter of policy than an application of Rule of Evidence 401; it fundamentally consists of what would be helpful to the jury in determining the appropriate punishment." *Garcia v. State*, 239 S.W.3d 862, 865 (Tex. App. – Houston [1st Dist.] 2007, pet. ref'd).

In the present case, it is unlikely that anyone was more familiar with Mr. Garrett or his background than his mother. Her thoughts and feelings regarding how her son should have been punished were relevant to his punishment. Because no one on jury knew anything about Mr. Garrett besides the facts of his underlying offense and – by that time – his criminal history, and because Ms. Lee had known him for his entire life of 29 years (RR 9, 59), she had deep insights into his character which would have been vital to the jury in making its determination of how to punish him. Although she apparently had not been to prison, Ms. Lee had a drug and alcohol history of her own. Happily, she had cleaned herself up and stopped using nine years prior to the trial. (RR 9, 62). Because of all of this, Ms.

Lee knew her son's problems, and knew from experience what was necessary to defeat the demons. Knowing her thoughts on her son's very serious problems, both legal and personal, would have assisted the jury as much – if not more – than the other punishment evidence presented.

The trial court abused its discretion when it excluded this evidence. This Honorable Court should reverse the sentence in this case and remand the case for a new sentencing trial. TEX. CODE CRIM. PROC. art. 44.29(b) (West 2006).

### Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, the Appellant prays the Court of Appeals to uphold the points of error, reverse the judgment of conviction and render an order of acquittal (First Point of Error); reverse the judgment of conviction and remand for a new trial (Second Point of Error); or reverse the sentenced and remand for a new sentencing hearing (Third Point of Error).

Respectfully submitted,

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender
Paul Elizondo Tower
101 W. Nueva St., Suite 370
San Antonio, Texas 78205
(210) 335-0701
FAX (210) 335-0707

mrobbins@bexar.org
Bar No. 16984600
ATTORNEY FOR APPELLANT

## Word Count Certificate of Compliance

Pursuant to TEX. R. APP. P. 9.4(i)(1) & (i)(2)(B) (West 2015), the word count, from the beginning of the Statement of Facts until, but excluding, the signature block, is 7,809. The total word count is 9,690. The Appellate Public Defender's Office uses Microsoft Word 2010.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Brief For Appellant has emailed to the Bexar County District Attorney's Office, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205, on November 9, 2015.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender